**RELIGIOUS OF THE SACRED HEART OF TEXAS et al., Petitioners,**

v.

**CITY OF HOUSTON, Respondent.**

No. D–1320.

Supreme Court of Texas.

July 1, 1992.

Marie R. Yeates, H. Dixon Montague, R. Glen Rigby, Catherine Bukowski, Shadow Sloan, Linda K. McCloud, Ewing Werlein, Jr., F. Russell Kendall, H. Ronald Welsh, Jason Kuller, Michael Mucchetti, Houston, for petitioners.

Joseph G. Rollins, Robert P. McConnell, Houston, for respondent.

OPINION

HIGHTOWER, Justice.

This is a condemnation action involving the partial taking of a private school for the purposes of extending a roadway. The case was submitted to the jury on the theory that the condemnee was entitled to compensation for the cost of purchasing substitute facilities. The jury returned a verdict for the condemnee in the amount of $18,-451,398. The condemnor appealed, arguing, among other things, that the trial court erred in applying the substitute facilities doctrine to the partial taking of a private school. The court of appeals reversed, holding that the substitute facilities doctrine did not apply. 811 S.W.2d 734. The primary question for our determination is whether the substitute facilities doctrine

applies to the partial taking of a private school. We hold it does not. We must also consider whether the condemnor waived the application of any theory of compensation other than the substitute facilities doctrine. We hold it did not. We affirm the judgment of the court of appeals and remand the cause to the trial court for further proceedings.

## I.

Religious of the Sacred Heart of Texas d/b/a Duchesne Academy ("Duchesne") is a private school for girls from pre-kindergarten through high school. Duchesne has operated since 1960 on 14.786 acres of land within the City of Houston ("the City"). To the north of the campus lies Buffalo Bayou, to the south is Memorial Drive, to the west is the Memorial Creole Apartments, and to the east are townhomes.

In 1988, the City commenced condemnation proceedings on 1.479 acres of Duchesne's campus. The City sought the property for the purpose of extending Chimney Rock Road from Memorial Drive to the Katy Freeway. The condemned tract included a parking lot, building, and playground. The condemnation also separated a .689 acre strip of land from the remainder of the campus. Duchesne contended that the strip was rendered useless. Duchesne also contended that an educational building located less than six feet from the new Chimney Rock right of way was rendered useless. Lastly, Duchesne contended that the remainder of the campus suffered substantial damages resulting from, among other things, increased noise and air pollution.

The county court at law[1] appointed a three-person panel of special commissioners to determine the appropriate compensation. *See* Tex.Prop.Code Ann. § 21.014 (Vernon 1984). The special commissioners determined that Duchesne should receive

$7,250,000. Duchesne and the City appealed.[2]

At trial the City contended that the remainder of the campus could be restored to its pre-taking utility by rebuilding the facilities taken and relocating many of the remaining structures. City experts testified that under this "cost to cure" theory, Duchesne was entitled to $4,400,000. Duchesne did not agree that the campus could be restored to its pre-taking utility on the remaining 12.618 acres. Duchesne argued that it needed to acquire a 7.9073 acre tract of land adjacent to the campus—the tract on which the Memorial Creole Apartments was located. Its theory was that under the "substitute facilities doctrine", it was entitled to compensation for the cost of acquiring the adjacent land. There was testimony that the owner of the apartments would sell the property for $12,055,470 ($35.00 per square foot). Duchesne's experts testified that the total cost of acquiring the land, demolishing the apartments, developing the site, and restoring the campus was $19,789,245. The City's theory differed from Duchesne's in that the City argued that under no circumstances was Duchesne entitled to compensation for the cost of acquiring substitute land. Accepting Duchesne's theory, the trial court submitted the case to the jury on a single question:

What do you find from a preponderance of the evidence was the reasonable cost on February 18, 1988, of land, if any, and improvements, if any, reasonably necessary to restore the remaining land and improvements at Duchesne Academy to substantially the same function and use that existed at Duchesne Academy before the City's taking of 1.479 acres of land and improvements thereon for construction and use of Chimney Rock Road?

1. In Harris County, the county court at law is vested with exclusive jurisdiction of eminent domain cases, regardless of the amount in controversy. *See* Tex.Gov't Code Ann. § 25.1032(c) (Vernon 1988 & Vernon Supp.1992).

2. The City deposited the amount of the special commissioners' award with the registry of the court and took possession of the condemned property. While the matter was awaiting trial, Duchesne, as it was entitled to do, withdrew these funds. *See* Tex.Prop.Code Ann. § 21.021(a)(1) (Vernon 1984).

In response to this question the jury awarded Duchesne $18,451,398. The City appealed, arguing, among other things, that the trial court erred in submitting the case to the jury on the substitute facilities doctrine. The court of appeals reversed and remanded, holding that the substitute facilities doctrine does not apply to the partial taking of a private school. 811 S.W.2d 734.

## II.

Duchesne argues that the substitute facilities doctrine should apply to the partial taking of a private school. We disagree. The substitute facilities doctrine provides that in certain limited circumstances the proper measure of compensation is the reasonable cost of acquiring a substantially equivalent substitute facility. It has generally been applied when public facilities are being condemned. *See* 4 Nichols, *Nichols on Eminent Domain,* § 12C.01[3][d] (3d ed. 1978); Annotation, *Eminent Domain: Cost of Substitute Facilities as Measure of Compensation Paid to State or Municipality for Condemnation of Public Property,* 40 A.L.R.3d 143 (1971). In this case, however, Duchesne contends that the doctrine should be applied to the partial taking of a private school.

The roots of the substitute facilities doctrine stem from *Brown v. United States,* 263 U.S. 78, 44 S.Ct. 92, 68 L.Ed. 171 (1923). *Brown* involved the flooding of three-quarters of a town in conjunction with the construction of a reservoir. 263 U.S. at 80, 44 S.Ct. at 93. The United States sought to condemn 120 acres of Brown's land for the purpose of rebuilding the town. 263 U.S. at 81, 44 S.Ct. at 93. Brown argued that such a taking was not for public use and therefore unconstitutional. 263 U.S. at 81, 44 S.Ct. at 93. After noting how "peculiar" the circumstances of the case were, as well as describing the particular problems associated with the taking of a city, the Supreme Court held that a "method of compensation by substitution would seem to be the best means of making the parties whole." 263 U.S. at 82–83, 44 S.Ct. at 94.

The Supreme Court again visited the doctrine in *United States v. 564.54 Acres of Land,* 441 U.S. 506, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979) ("*Lutheran Synod*"). *Lutheran Synod* involved the condemnation of three private, nonprofit, summer camps. The condemnee argued that because the camp was a nonprofit organization, it was absolutely entitled to a substitute facilities measure of compensation. 441 U.S. at 508, 99 S.Ct. at 1855. The Supreme Court disagreed, holding that the condemnee's nonprofit status was not a basis for distinguishing it from other business enterprises. The Supreme Court observed:

> [T]here is no reason to treat respondent differently from the many private homeowners and other noncommercial property owners who neither derive earnings from their property nor hold it for investment purposes. Unless the Just Compensation Clause mandates a Government subsidy for nonprofit organizations, a proposition we find patently implausible, respondent's nonprofit status does not require us to reject the application of the fair-market-value standard.

441 U.S. at 515, 99 S.Ct. at 1859. The Supreme Court also rejected the argument that additional compensation was warranted because the camps were reasonably necessary to the public welfare. 441 U.S. at 515, 99 S.Ct. at 1859. Unable to ascertain any rationale requiring the suspension of the normal rules for determining just compensation, the Supreme Court held that the fair market value measure applied. 441 U.S. at 515, 99 S.Ct. at 1859. Specifically left unanswered, however, was the proper measure of compensation for the condemnation of public property. 441 U.S. at 509 n. 3, 99 S.Ct. at 1856, n. 3.

This question was resolved in *United States v. 50 Acres of Land,* 469 U.S. 24, 105 S.Ct. 451, 83 L.Ed.2d 376 (1984). *50 Acres* involved the taking of land used as a sanitary landfill by the City of Duncanville, Texas. 469 U.S. at 26, 105 S.Ct. at 453. Duncanville argued that, as a public entity, it was automatically entitled to compensation for the cost of acquiring a substitute site. 469 U.S. at 26–27, 105 S.Ct. at 453. The Supreme Court rejected this argument,

holding that "[n]othing in *Brown* implies that the Federal Government has a duty to provide the city with anything more than the fair market value of the condemned property." 469 U.S. at 33, 105 S.Ct. at 456–57. Although *50 Acres* rejected the premise that the substitute facilities doctrine automatically applies to all takings of public property, the Supreme Court did not resolve whether the doctrine retains any applicability. *See* 469 U.S. at 37, 105 S.Ct. at 458 (O'Connor, J., concurring).

In Texas, the substitute facilities doctrine has been discussed in two cases. The doctrine was first applied in *State of Texas v. Waco Indep. School Dist.*, 364 S.W.2d 263 (Tex.Civ.App.—Waco 1963, writ ref'd n.r.e.). Relying in part on *Brown*, the court of civil appeals held that because a duty existed to rebuild the taken premises, a public school was entitled to compensation for the cost of acquiring additional land. *Id.* at 268. The second case was *City of San Antonio v. Congregation of the Sisters of Charity*, 404 S.W.2d 333 (Tex.Civ.App.—Eastland 1966, no writ). *City of San Antonio* involved an appeal from a temporary injunction enjoining the condemnor from exercising its power of eminent domain over land belonging to a private school. *Id.* at 334. In support of its holding that the statute providing the measure of compensation was constitutional, the court stated:

> We do not believe that it was the holding in the Waco case, even by implication, that the owner of a private school whose land is condemned is ... limited to a recovery under the market value test if the evidence shows that such test will not adequately compensate the owner for special damages suffered.... The proper measure of damages for taking part of the land of a private school, where special damages are suffered, is the same as it is in like cases where the land of a public school is taken.

*Id.* at 337.

Duchesne relies heavily upon *City of San Antonio*, arguing that it was properly decided and should be applied to this case. Duchesne also asserts that the limitations on the application of the substitute facilities doctrine recognized in *Lutheran Synod* and *50 Acres* are not determinative since both cases involved situations in which there was evidence of "market value".[3] Thus, Duchesne concludes that the substitute facilities doctrine remains applicable in any condemnation case in which no evidence of "market value" is presented. This is not correct. Nothing in *Lutheran Synod* or *50 Acres* supports such an application of the substitute facilities doctrine. *Lutheran Synod* rejected the automatic application of the doctrine to nonprofit private entities, while *50 Acres* rejected the automatic application of the doctrine to public property. Duchesne's assertion that the substitute facilities doctrine can somehow apply if there is no evidence of "market value" misinterprets the broad concept of market value. *See infra* at 610. It also fails to recognize that when the Supreme Court uses language such as "fair market value is not ascertainable", it is only stating that there is a lack of comparable sales to utilize the market data approach to determining market value. In *United States v. Toronto, Hamilton & Buffalo Navigation Co.*, 338 U.S. 396, 70 S.Ct. 217, 94 L.Ed. 195 (1949), the Court stated:

> At times, however, peculiar circumstances may make it impossible to determine a "market value." There may have been, for example, so few sales of similar property that we cannot predict with any assurance that the prices paid would have been repeated in the sale we postulate of the property taken. We then say that there is "no market" for the property in question.... And it is here that other means of measuring value may have relevance—but only, of course, as bearing on what a prospective purchaser would have paid.

---

3. In *Lutheran Synod*, the Court noted the existence of "a market for camps, albeit not an extremely active one." *Lutheran Synod*, 441 U.S. at 513, 99 S.Ct. at 1858. Likewise, in *50*

*Acres*, the Court noted the existence of a "fairly robust" market for sanitary landfill properties. *50 Acres*, 469 U.S. at 30, 105 S.Ct. at 455.

We agree ... that in this case there was no Great Lakes "market" in the sense discussed above.

338 U.S. at 402, 70 S.Ct. at 221.[4] In *Lutheran Synod*, the Court looked to the fact that there were "11 recent sales of comparable facilities" in holding that the property had a "readily discernable market value." *Lutheran Synod*, 441 U.S. at 513, 99 S.Ct. at 1858. Likewise, in *50 Acres*, the Court looked to testimony regarding "the sale prices of comparable property" in holding that the property had a market value. *50 Acres*, 469 U.S. at 30, 105 S.Ct. at 455. Consequently, in neither of these cases was there a need for the Court to look to other methods of determining market value. Of additional significance is that in *50 Acres* the court noted the existence of the cost method of determining market value, stating: "Of course, we express no view on the admissibility of testimony **on reproduction cost when it is offered on the issue of fair market value.**" 469 U.S. at 36 n. 24, 105 S.Ct. at 458 n. 24 (emphasis added). This state also recognizes the cost approach as a valid method of determining market value. *See infra* at 616. Consequently, Duchesne's assertion that the substitute facilities doctrine applies when there are no comparable sales is erroneous.

Additional language in *50 Acres* supports our rejection of the doctrine in this context. In regard to the general applicability of the doctrine, the court stated:

[T]he open-ended character of the substitute-facilities standard increases the likelihood that the city would actually derive the windfall that concerned both the District Court and the Court of Appeals. "Particularly is this true where these issues are to be left for jury determination, for juries should not be given sophistical and abstruse formulas as the basis for their findings nor be left to apply even sensible formulas to factors that are too elusive."

469 U.S. at 36, 105 S.Ct. at 458 (footnote omitted).[5] Furthermore, specifically in regard to private condemnees, the Court cited *Lutheran Synod* for the proposition that:

If the city were a private party rather than a public entity, however, the possibility that the cost of a substitute facility exceeds the market value of the condemned parcel would not justify a departure from the market value measure.

469 U.S. at 30, 105 S.Ct. at 455. The court also stated:

This view is consistent with our holding in *Lutheran Synod* that fair market value constitutes "just compensation" for those private citizens who must replace their condemned property with more expensive substitutes....

469 U.S. at 33, 105 S.Ct. at 457. We believe this language sounds the death knell for the application of the substitute facilities doctrine to private property. For these reasons, we reject Duchesne's contention that *50 Acres* somehow implies that the substitute facilities doctrine can be applied to takings of private property when market value cannot be determined by the market data approach.[6] The commentators are

---

**4.** One author notes that at times the Supreme Court has failed to clearly recognize the different methods of determining market value. She states:

While the Supreme Court has established fair market value as the standard for just compensation, it seems to have equated market value only with the market data approach, when, in fact, the market data approach, the cost approach, and the income approach are all accepted appraisal methods for determining fair market value.

N. Ackermann, Comment, *Just Compensation, Land–Use Regulation, and the Compensable Temporary Taking: First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 28 Nat. Resources J. 393, 408 n. 142 (1988) (citations omitted).

**5.** Also indicative of the Supreme Court's dissatisfaction with the doctrine is the following language of *50 Acres:*

"Taken in context, the apparent endorsement [in *Brown* ] of compensation by substitution is made in support of the Government's power to condemn the property in *Brown* and does not state the proper measure of compensation in another case." *50 Acres*, 469 U.S. at 33, 105 S.Ct. at 456.

**6.** We need not determine whether the substitute facilities doctrine would ever be applicable in a case involving the taking of public property.

also uniform in stating that, as a result of *Lutheran Synod* and *50 Acres*, the continued viability of the doctrine is questionable. *See* M. Schill, *Intergovernmental Takings and Just Compensation: A Question of Federalism*, 137 U.Pa.L.Rev. 829, 889–97 (1989) (discussing "demise" of the doctrine); J. Durham, *Efficient Just Compensation as a Limit on Eminent Domain*, 69 Minn.L.Rev. 1277, 1291 (1985) (although disagreeing with Court, cites *50 Acres* "as an indictment of the substitute-cost measure of valuation"); J. Payne, *Intergovernmental Condemnation as a Problem in Public Finance*, 61 Tex.L.Rev. 949, 1010 (1983) (stating that the "analytic foundations of the substitute facilities doctrine have recently been questioned"); J. Gelin & D. Miller, *The Federal Law of Eminent Domain*, § 3.6 (1982) ("[*Lutheran Synod*] is only precedent for not using substitute valuation when the government condemns property owned by a private nonprofit organization and operated for a public purpose.").

Thus, armed only with *City of San Antonio* as authority,[7] Duchesne asks us to apply its holding and broaden a doctrine that the Supreme Court has recently limited, criticized as providing a windfall, and labelled "a dictum". *See 50 Acres*, 469 U.S. at 31, 36, 105 S.Ct. at 456, 458. *City of San Antonio* floats alone in a sea of contrary authority. It was decided without citation to authority and has not been affirmatively relied upon by any court.[8] In fact, numerous courts have rejected the use of the substitute facilities doctrine in

cases involving private property. *See, e.g., People v. Young Women's Christian Ass'n of Springfield*, 74 Ill.2d 561, 25 Ill. Dec. 649, 655, 387 N.E.2d 305, 311 (1979) (doctrine inapplicable to condemnation of land and buildings owned by YWCA); *State of Oregon v. First Methodist Church of Ashland*, 6 Or.App. 492, 488 P.2d 835, 836–37 (1971) (doctrine inapplicable to condemnation of church youth center); *Urban Renewal Agency v. Gospel Mission Church and School*, 4 Kan.App.2d 101, 603 P.2d 209, 212–14 (1979, review denied) (doctrine inapplicable to taking of church). Even Duchesne admits that besides *City of San Antonio* it possesses a dearth of authority in support of its position. We refuse to reach a result that would significantly broaden the scope of a waning doctrine. For these reasons, we hold that the substitute facilities doctrine does not apply to the taking of a private school.

### III.

Duchesne also argues that even if the substitute facilities doctrine does not apply, the City waived the application of any other theory of compensation. We disagree.

The correct measure of compensation was a sharply contested issue throughout trial. The record is replete with objections indicating the lengths to which the City went to preserve error regarding the erroneous use of the substitute facilities doctrine.[9] There can be no doubt that the City

---

*See 50 Acres*, 469 U.S. at 37, 105 S.Ct. at 458 (O'Connor, J., concurring).

**7.** Duchesne also relies upon the Uniform Eminent Domain Code. *See* Unif. Eminent Domain Code § 1004(b), 13 U.L.A. 90 (1986). Approved in 1974, it provides that the substitute facilities doctrine may be applied to cases involving private entities "operated upon a nonprofit basis". This, however, was the exact proposition rejected by the Supreme Court in *Lutheran Synod. See also Lutheran Synod*, 441 U.S. at 517 n. 1, 99 S.Ct. at 1860 n. 1 (White, J., concurring) (referring to code along with cases employing doctrine).

**8.** Additionally, we note that *City of San Antonio* was not an appeal from an award of compensa-

tion but an appeal from a temporary injunction. The court of civil appeals' discussion regarding the substitute facilities doctrine was in the context of the constitutionality of the compensation statutes.

**9.** Because Duchesne relies so heavily upon its waiver argument, we have outlined those places in the record indicating both the City's theory of compensation and the City's objections to the use of the substitute facilities doctrine.
*Pleadings*
1) City answers interrogatories stating that its experts tell it that the proper approach is "market value of the land and improvements actually condemned, plus the damages (measured by a 'cost to cure' concept) to the remainder."

properly apprised the trial court of its objection to the erroneous use of the substitute facilities doctrine. The question, therefore, becomes whether the City, to

2) City files motion for separate trial or hearing stating that substitute facilities doctrine doesn't apply since proper measure of damages is cost to cure and market value.

3) City files supplemental petition arguing that substitute facilities provides excess indemnity and violates Texas and U.S. Constitutions.

4) City files motion in limine concerning any offers to buy apartments.

*Pre–Trial*

1) Trial court states that it appears the case will be submitted on substitute facilities doctrine but will not rule until after evidence heard.

2) Trial court states it has overruled City's objections to use of substitute facilities doctrine.

*Voir Dire*

1) Trial court advises jury it is to determine what it will cost Duchesne to get substitute facilities.

2) Trial court advises jury that sole issue is what a substitute facility would cost.

3) City objects to informing jury that substitute facilities doctrine applies.

4) Trial court advises jury it is to determine substitute facilities; what it would cost school to get land and be in same condition.

5) City asserts that each time Duchesne or the court uses the term substitute facility the error gets "more acute".

6) City renews objection to discussion of substitute facilities during voir dire since it assumes a position of law not yet determined.

7) City makes it clear that it is renewing objection to substitute facilities line of questioning in order to preserve error.

8) City states it has "protected my record" so will no longer object at risk of "wrath of the Court".

9) Court allows City to advise jury that it has a different "theory"; being that it believes proper measure of damages is market value of land taken and damage to remainder.

10) City reiterates to jury the existence of two different theories of the case.

*Trial*

1) City objects to substitute facilities doctrine several times.

(a) MR. ROLLINS: If the Court please, we're again going to object to this line of questioning and testimony which represents a Substitute Facility's Doctrine. And in this case it is not the proper measure of damages, and is irrelevant to the issues that should be at Bar here and is prejudicial.

(b) MR. ROLLINS: Your Honor, the Plaintiff, City of Houston, objects to this line of questioning which ... [is] ... attempting to inject the Substitute Facility's Doctrine in this case because this is a case where there is a private school without the power of condemnation....

2) City expert explains the three valuation approaches (market, cost and income).

3) City's experts testify concerning cost to cure.

4) City's experts testify regarding market value of property actually taken.

5) City's experts testify regarding cost to demolish and rebuild buildings.

6) Duchesne states that it has "heard [the City] come up here time and time again to object to the measure of damages that we're using in this case."

7) City's expert testifies Duchesne is a special purpose property and schools are not sold in the open market place.

8) Several discussions regarding preservation of error.

(a) MR. ROLLINS: Your Honor, I think if it is error, I think that I have preserved it by my objections, and I will not—
THE COURT: I think also that, of course, I'm not telling you, but all you have to do is, I think, that question is probably arrived at on the issue. It's either the law or it's not the law.
MR. ROLLINS: That's right.
THE COURT: And, sir, you're not trying—it can never be said you were trying something back in when that wasn't the law.
MR. ROLLINS: Your honor, I just think this is a very important point of law.
THE COURT: It's the whole case.
MR. ROLLINS: Yes sir. And just out of an—I don't want to impose on the Court's time, but out of an abundance of caution, I'm again making the objection.
THE COURT: You feel free to make any objections any time you want, sir. That's what we're here for.
MR. ROLLINS: And is the Court overruling my objection?
THE COURT: Yes sir. I've specifically overruled it.
(b) THE COURT: Well, I think we've been through all this.
MR. ROLLINS: Your Honor, I just wanted to be double safe.

*Charge*

1) City's charge based upon cost to cure refused.

2) City's objections to charge including: (a) substitute facilities doctrine does not apply because Duchesne is a private school and has no legal duty to replace its facilities, (b) substitute facilities doctrine provides a windfall to Duchesne, (c) substitute facilities doctrine inapplicable since no showing that market value measure of damages to the remainder based on the cost approach deviates significantly from making Duchesne whole.

*Post–Trial*

1) City files motion for new trial arguing that it was error to submit the substitute facilities doctrine to the jury because (a) Duchesne is a private school, (b) Duchesne has no legal duty to rebuild, and (c) Duchesne has no eminent domain power. City also argues no evidence and insufficient evidence.

properly preserve error, possessed a burden to submit a correct alternative measure of compensation. If the City had such a burden and failed to submit such a measure, Duchesne is correct in arguing that the City is stuck with the substitute facilities doctrine. If the City did not have such a burden or if it submitted a correct alternative theory of compensation, Duchesne's waiver argument fails.

While the burden of proof regarding the right to condemn and certain other matters is generally on the condemnor, the "burden as to value is on the condemnee." *Miers v. Housing Authority of City of Dallas*, 153 Tex. 236, 266 S.W.2d 842, 845 (1954). In this regard, when the only questions submitted relate to market value and damages, the condemnee has the right to open and close the jury argument. *See, e.g., Phillips v. Southwestern Bell Telephone Co.*, 559 S.W.2d 464, 465 (Tex.Civ.App.—Houston [14th Dist.] 1977, no writ). *See also City of Fort Worth v. Beaupre*, 617 S.W.2d 828, 832 (Tex.Civ.App.—Fort Worth 1981, writ ref'd n.r.e.) (by failing to tender, condemnor waived objection to trial court's failure to submit instruction stating that burden of proof on condemnee). In the first edition of his treatise, Judge Rayburn stated:

> [R]egardless of whether there is a stipulation or not, if the issues are submitted in the usual form as to value, and there is no dispute as to the jurisdiction, power, or authority of the condemnor to exercise the authority of condemnation, and the issues are merely submitted on value of the land taken, and the damages to the remaining lands if any, in that case, *the charge submits only matters on which the condemnee has the burden of proof, and condemnee has the right to proceed with his evidence first, and to open and close the arguments, not by reason of the stipulation, or the lack of it, but by reason of the force of the wording of the Rules of Civil Procedure.*

M. Rayburn, *Texas Law of Condemnation*, § 83 (1960) (emphasis in original). Although the record does not contain a stipulation, the parties were aware that Du-

chesne had the burden of proof. Duchesne opened first, presented its case first, and closed first. In fact, at a pre-trial hearing counsel for Duchesne stated: "I've had jury panels who thought that it's the property owner who is suing to get the compensation **because of the way the burden of proof is** ..." (emphasis added).

Also relevant is the fact that Duchesne withdrew the award of the special commissioners. We have held that if the condemnee withdraws the award, as Duchesne did, the condemnee waives all issues other than the adequacy of the compensation. *State v. Jackson*, 388 S.W.2d 924, 925 (Tex. 1965). We also noted in *Jackson* that in such a situation the burden of proof lies with the condemnee. *Id.* at 926; *see also Coastal Indus. Water Auth. v. Celanese Corp.*, 592 S.W.2d 597, 599 (Tex.1979).

Consequently, since the burden of proof regarding compensation was with Duchesne, we must determine the City's burden in objecting to the erroneous submission of the charge on the substitute facilities doctrine. In the condemnation context, the condemnor need only specifically object to the use of an incorrect measure of compensation. *See Brazos Electric Power Cooperative, Inc. v. Taylor*, 576 S.W.2d 117, 119–20 (Tex.Civ.App.—Waco 1978, writ ref'd n.r.e.) (condemnor's objection that "the charge fails to submit the proper measure of damages" too general); *State v. Dunn*, 574 S.W.2d 821, 825 (Tex.Civ.App.—Amarillo 1978, writ ref'd n.r.e.) (absent specific objection, condemnor waived complaint that charge allowed double recovery); *Southwestern Bell Telephone Co. v. Ramsey*, 542 S.W.2d 466, 475–76 (Tex.Civ. App.—Tyler 1976, writ ref'd n.r.e.) (condemnor's requested issues, even if in correct form, are not a substitute for an objection). *Cf. Gandy v. State*, 293 S.W.2d 534, 538 (Tex.Civ.App.—Waco 1956, writ ref'd n.r.e.) (*condemnee's* failure to submit correct issue constitutes waiver of complaint regarding proper measure of damages).

The rule stated in these condemnation cases is consistent with the general rules regarding the preservation of error in the charge. This case involved a defectively

submitted question. Therefore, only a specific objection was necessary. The rule applicable in this situation was properly stated in *Lyles v. T.E.I.A.*, 405 S.W.2d 725 (Tex.Civ.App.—Waco 1966, writ ref'd n.r.e.):

> [A] request for submission is the method of preserving the right to complain of omission of, or failure to submit an issue which is relied on by the complaining party. **Objection, however, is the proper method of preserving complaint as to (1) an issue actually submitted, but claimed to be defective;** or (2) failure to submit, where the ground of recovery or defense is relied on by the opposing party.

*Id.* at 727 (emphasis added); *see also Cosgrove v. Grimes*, 774 S.W.2d 662, 665–66 (Tex.1989) (although damages issues defectively submitted, defendant "failed to object to them by distinctly pointing out any error"); *Wilgus v. Bond*, 730 S.W.2d 670, 672 (Tex.1987) (although erroneous measure of damages submitted, defendant "waived any error in the submission by failure to properly object"); *American Transfer & Storage Co. v. Reichley*, 560 S.W.2d 196, 199–200 (Tex.Civ.App.—Amarillo 1977, writ ref'd n.r.e.) ("Unless a party objects to the charge on the ground that it submits an improper measure of damages, he waives the objection and cannot complain on appeal that the charge permitted the jury to find damages based on the wrong measure."). The City explicitly objected to the charge on the ground that the substitute facilities doctrine did not apply to private schools. We hold that this objection was sufficient to preserve error regarding the erroneous submission of the case on the substitute facilities doctrine. Because of this holding, we need not consider whether the City's proposed charge was a correct statement of the law.[10]

---

**10.** We also note that Duchesne's argument that the City's "cost to cure" theory of compensation was the same as the substitute facilities doctrine is without merit. In his treatise on condemnation law, Nichols writes:

> [T]he market measure has been applied to private schools while public schools are treated by the substitute approach.... In some instances, the cost approach has been used in lieu of the substitution approach so that depreciation may be taken into account. **Also, damages to improvements on the remaining property have been recognized, usually in the form of cost to cure.**

4 Nichols, *Nichols on Eminent Domain*, § 12C.01[4][d] (3d ed. 1978) (emphasis added). Nichols also states:

> A peculiar problem in this area is presented where there is a partial taking of special purpose property. Usually, the difference between the before and after value of the property is the measure of compensation, reflecting damages to the remaining property as well as the value of the part taken.... **Costs of curing defects caused by the taking may affect the after-value.**

*Id.* at § 12C.01[2] (emphasis added). Others have used the term as well. In discussing damages to the remainder in partial taking cases, one appraisal manual provides:

> Some courts, on the other hand, take the following position, which, in the author's opinion, seems eminently more sound. **That is that the evidence of restoration costs, or as more commonly called in recent years, 'costs to cure,' is competent as bearing on the diminution of the value of the remainder caused by the taking.**

H. Kaltenbach, *Master Guide to the Successful Handling of Condemnation Valuation*, 913 (1972). Additionally, cost to cure is recognized by numerous states. In *Central Louisiana Electric Co. v. Huckabay*, 446 So.2d 1327 (La.App.2d Cir.), *writ denied*, 450 So.2d 361 (1984), the court stated:

> This is not a unique case requiring the award of 'cost to cure' damages or any other special damages over and above diminution in market value of the remainder.

*Id.* at 1331. In *City of Elkhart v. NO–BI Corp.*, 428 N.E.2d 43 (Ind.App.1981), the court held:

> Where an award is made for a partial taking ... full compensation equals the fair market value of the land taken plus the value of damages to the residue. An owner whose land is taken in an eminent domain proceeding may be compensated for every element of damage that will naturally and ordinarily result from a taking. One type of such damage may be the cost to cure any defects caused by the taking. A properly compensated cost to cure may consist of the cost of remodeling the owner's facility where the taking has resulted in loss of use, total or partial, of a loading dock.

*Id.* at 45; *see also Division of Admin., State of Florida Dept. of Transp. v. Frenchman, Inc.*, 476 So.2d 224, 227 (Fla.App.1985), *review dism'd*, 495 So.2d 750 (Fla.1986) (cost to cure can be used to mitigate the amount of the award when it exceeds the difference in market value); *B & B Food Corp. v. State of New York*, 96 A.D.2d 893, 466 N.Y.S.2d 60, 60 (1983) (cost to cure approach may not be used when the cure must be accomplished by going outside the tract in controversy).

Duchesne raises an additional issue warranting our consideration. Duchesne strongly asserts that the City failed to offer any evidence regarding the market value measure of compensation and that its experts admitted the inapplicability of the market value measure of compensation.[11] We have previously noted that the City did not have the burden to offer a correct measure of compensation. Furthermore, Duchesne's argument that the City admitted the inapplicability of the market measure of compensation confuses the broad concept of "market value" with "market data", the most common of the approaches used in determining "market value".[12] In his treatise, Nichols states:

> [T]here are a number of approaches used in the valuation of condemned properties, namely, **the market data or comparable sales approach, the cost approach, and the income approach**.... [I]t should be noted that the market data approach, the usual approach in residential takings, is ordinarily modified in cases of special use property and proof based on the other methods is usually allowed. A further modification may be the use of the substitute method. No matter which method is used, however, **it must also be remembered that they are all merely factors to be considered in arriving at the value of the property.**

4 Nichols, *Nichols on Eminent Domain*, § 12C.01[3] (3d ed. 1978) (emphasis added). As an alternative to the market data approach, Nichols describes the cost approach as follows:

> Where a building is a specialty, and, in a sense, unique, [c]onstructed for a special purpose, the valuation cannot be predicated on the same basis as a building constructed for general or usual dwelling or commercial use. In the case of a

specialty there is a limited market and the customary testimony of market price is not available. It has been held under such circumstances that reproduction cost, or replacement cost, minus depreciation, may be considered. It may even be the only method in some situations. However, it must be remembered that the value arrived at by use of this approach is merely a factor to be considered and is not the sole measure of compensation.

*Id.* at § 12C.01[3][b]. Another commentator writes:

> [I]n the absence of sales prices of similar property, the court must find some other criterion of value, and of these the most acceptable is the replacement cost of the property taken.... Accordingly, in these cases we find the courts estimating the value of the land separately on the basis of the sale price of other similar land in the vicinity and adding thereto the cost of reproduction less depreciation of the structure in order to arrive at the value of the entire property.

2 Orgel, *Valuation Under the Law of Eminent Domain*, § 246 (2d ed. 1953); *see also id.* at § 38 n. 7 (citing cases "distinguishing between 'market value in a strict sense', which is lacking in the absence of an active market, and market value in a broad sense."); J. Gelin & D. Miller, *The Federal Law of Eminent Domain*, § 4.1 (1982) ("There are three common methods of valuing property taken under the power of eminent domain. Each of these methods is designed to reach the fair market value ..."). Additionally, an appraisal manual discusses the issue as follows:

> In assignments to estimate market value, the ultimate goal of the valuation process is a well-supported value conclusion that reflects the appraiser's study of

---

**11.** The City's experts testified that schools are not sold in the marketplace.

**12.** The fallacy in Duchesne's argument is illustrated in its counsel's opening remarks during oral argument before this court:

> [T]he court of appeals erroneously, we believe, reversed the jury's finding of damages for the school and imposed on the school a market value measure of damages in the face

of evidence—in fact, conclusive evidence—undisputed evidence—that schools are not bought and sold in the marketplace, and, therefore, that there is no market for school property.

Contrary to this statement, the fact that schools are not bought and sold in the marketplace means only that the market data approach cannot be used in determining market value.

all factors that influence the market value of the property being appraised. To achieve this goal, an appraiser studies a property from three different viewpoints, which correspond to three traditional approaches to value.

1. The value indicated by recent sales of comparable properties in the market—the sales comparison approach.
2. The current cost of reproducing or replacing the improvements, minus the loss in value from depreciation, plus land value—the cost approach.
3. The value of the property's earning power based on the capitalization of its income—the income capitalization approach.

American Institute of Real Estate Appraisers, *The Appraisal of Real Estate*, 62 (9th ed. 1987); *see also id.* at 349 ("The cost approach is also used to estimate the market value of proposed construction, special purpose properties, and other properties that are not frequently exchanged in the market.").

Texas also recognizes the existence of various methods of determining market value. Judge Rayburn states:

An analysis of the cases discloses that there are four main types of evidence that are allowed to be introduced into evidence as bearing upon the hypothetical market issues and that have been, and are frequently and customarily used by expert real estate witnesses to substantiate their market value opinions.... These four types of evidence are:

(1) Comparative market sales;

(2) Replacement cost less depreciation....

(3) Capitalization of income....

(4) Real, actual or intrinsic value....

M. Rayburn, *Rayburn on Condemnation*, § 16.00 (1987).[13] In discussing the cost approach, Rayburn writes that its use is proper as long as it is made clear to the jury that the **"ultimate point of inquiry and decision is market value...."** *Id.* at § 16.04 (emphasis in original). This court has also discussed the distinction between the broad concept of market value and the various approaches used in its determination. In *City of Austin v. Cannizzo*, 153 Tex. 324, 267 S.W.2d 808 (1954), we stated:

Market value is not restricted to prevailing price.... It was clearly error to instruct the jury that the 4.57 acre tract had no market value unless the evidence revealed "a sufficient number of recent sales of comparable property to establish a prevailing price."

267 S.W.2d at 812; *see also Huckabee v. State*, 431 S.W.2d 927, 930–32 (Tex.Civ. App.—Beaumont 1968, writ ref'd n.r.e.) (error to exclude expert testimony regarding the various approaches in determining market value); *State v. Richardson*, 215 S.W.2d 359, 361 (Tex.Civ.App.—Eastland 1948, writ ref'd n.r.e.) ("But it does not necessarily follow that in the absence of such [comparable] sale or sales, the tract involved had no market value. By sale or sales of entirely similar tracts is not an exclusive method of proving market val-

---

**13.** In his amicus brief, Judge Rayburn states he was mistaken when he wrote in the first edition of his treatise that "[c]hurches, colleges and public institutions, although hard to sell, do have a market value". *See* M. Rayburn, *Texas Law of Condemnation*, § 93 (1960). Judge Rayburn advises this court that he "corrected that mistake" in a 1972–73 supplement to the first edition. Curiously, however, a revised edition of Judge Rayburn's treatise, released in 1987 and updated in November 1991, continues to contain the following statement:

There is nothing actually that does not have a market value, for the fact remains, that if by reason of its location, existence or surroundings, it had no marketability, it would by the same token have no intrinsic worth,

except as some sentimental bauble of its owner.

M. Rayburn, *Rayburn on Condemnation*, § 19.01 (1987 & Supp.1991) (emphasis added). In fact, in the most recent supplement to his treatise, Judge Rayburn, after discussing this case, repeats the statement that "[c]hurches, colleges, and public institutions, although hard to sell, do have a market value". *Id.* While it is true Judge Rayburn also refers to the use of evidence regarding the cost of substituting a similar property, he concludes that the "ultimate issue" is the "hypothetical market value". *Id.* These statements can hardly be considered as supporting, and in fact are contrary to, Duchesne's position that private schools do not have a market value.

ue.").[14]

■ The City's admission that schools are not sold on the open market and its failure to provide evidence regarding comparable sales do not, as Duchesne suggests, constitute a waiver of the market value measure of compensation. This case presents a unique situation involving the partial taking [15] of a special purpose [16] property. The City correctly recognized that the most common method of determining market value—the market data approach—could not be successfully utilized in this situation. Consequently, the City concluded that resort to additional methods of determining market value was necessary. At trial, the City argued the applicability of these methods and offered evidence regarding their application. We hold that the City did not waive the market value measure of compensation.[17]

## IV.

The broad concept of market value, combined when necessary with the particularized rules involving partial takings and special purpose properties, has adequately served as the measure of compensation in Texas condemnation cases for over a century. Although presenting unique and sympathetic facts, this case does not justify a departure from the market value concept.[18]

---

**14.** The issue has arisen in the tax context since it also uses the "market value" concept. For example, in *Polk County v. Tenneco, Inc.*, 554 S.W.2d 918 (Tex.1977), we stated:

> The market value of Tenneco's pipelines was highly contested at trial, and it was not an easy question to resolve. Segments of natural gas pipelines ... are rarely sold; and their market value therefore generally cannot be determined by comparing the prices brought by sales of similar properties ... [citing *Cannizzo* and *State v. Carpenter*, 126 Tex. 604, 89 S.W.2d 194]. Thus, the "comparable sales" method of appraising property is of little use in valuing pipelines; and two other methods of appraisal must be used in assessing those properties. These two methods are the cost approach to value and the income approach to value.

*Id.* at 921 (court also gives explanation of cost approach). *See also Cherokee Water Co. v. Gregg County Appraisal Dist.*, 801 S.W.2d 872 (Tex.1990) (general discussion); *Missouri–Kansas–Texas R.R. Co. v. City of Dallas*, 623 S.W.2d 296, 300 (Tex.1981) (stating that cost and income approaches are recognized alternative approaches); *Missouri Pac. R.R. Co. v. Midland Indep. School Dist.*, 647 S.W.2d 62, 63–64 (Tex. App.—El Paso 1983, writ ref'd n.r.e.) (recognizing three approaches to determining market value).

**15.** Substantial authority exists concerning partial taking cases. *See, e.g.*, Tex.Prop.Code Ann. § 21.042(c) (Vernon 1984); *Callejo v. Brazos Electric Power Coop., Inc.*, 755 S.W.2d 73 (Tex. 1988); *State v. Schaefer*, 530 S.W.2d 813 (Tex. 1975); *Uselton v. State*, 499 S.W.2d 92 (Tex. 1973); *City of Pearland v. Alexander*, 483 S.W.2d 244 (Tex.1972); *State v. Walker*, 441 S.W.2d 168 (Tex.1969); *State v. Zaruba*, 418 S.W.2d 499 (Tex.1967); *State v. Meyer*, 403 S.W.2d 366 (Tex. 1966); *City of Austin v. Cannizzo*, 153 Tex. 324, 267 S.W.2d 808 (1954); *State v. Carpenter*, 126 Tex. 604, 89 S.W.2d 194 (1936), *op'n on reh'g*, 126 Tex. 618, 89 S.W.2d 979 (1936); *Buffalo Bayou, Brazos & Colorado R.R. Co. v. Ferris*, 26 Tex. 588 (1863).

**16.** Special purpose properties generally include, among other things, churches, parks, schools and cemeteries. *See, e.g.*, 4 Nichols, *Nichols on Eminent Domain*, § 12C.01 (3d ed. 1978).

**17.** We have received numerous amicus curiae briefs filed on behalf of Duchesne's position. Unfortunately, they all make the mistake of equating "market data" with "market value", and concluding that because there is no market for schools the substitute facilities doctrine applies. For example, the Episcopal Diocese states that it is "clear that if a property has a market value (*i.e.*, its value can be established through comparable sales), the substitute facilities or cost to cure measure is not applicable." This is not correct. Market value differs from the market data approach to determining market value. By way of analogy, we find a 1966 condemnation article written by counsel for the City instructive:

> "One of the inadequacies of language is that sooner or later, the thing is confused with the symbol for that thing. When the mind is centered on the verbal description of something instead of the thing itself, we conclude that 'Pigs are rightly named, since they are such dirty animals.'"

J. Rollins, *What Is Intrinsic Value?*, 29 Tex.B.J. 95, 95 (1966) (quoting *Gaines v. Bader*, 253 S.W.2d 1014, 1016 (Tex.Civ.App.—San Antonio 1952, no writ) (Pope, J.)). In this case, Duchesne and the amici confuse "the thing" (the determination of a property's market value) with "the symbol for that thing" (the term "market value").

**18.** As one commentator has stated: "In summary, one must reconcile himself to the somewhat harsh but necessitous reality that the government must from time to time 'take' property." R. Rutland, Jr., *Eminent Domain Litiga-*

In summary, we hold that the substitute facilities doctrine does not apply to the taking of a private school and that the City properly preserved error in regard to the erroneous use of the doctrine. For these reasons, the judgment of the court of appeals is affirmed and this cause is remanded to the trial court for further proceedings.

Concurring opinion by CORNYN, J.

Dissenting opinions by GONZALEZ and COOK, JJ.

CORNYN, Justice, concurring.

I agree with the court that the trial court erred in submitting this case to the jury on the substitute facilities doctrine. I write separately, however, because I disagree with the court's conclusion that the doctrine can never be applied to the taking of private property. I would hold that the substitute facilities doctrine, applied to public and private entities alike, remains viable, but that Duchesne has not satisfactorily demonstrated the inapplicability of the market value approach to the facts of this case.

The United States Constitution requires that a condemnee receive "just compensation." *See* U.S. Const. amend. V.[1] This requirement cannot turn, as the court holds, on whether the condemnee is a public or private entity. *See United States v. 50 Acres of Land*, 469 U.S. 24, 34, 105 S.Ct. 451, 457, 83 L.Ed.2d 376 (1984).

Although the constitutional standard for just compensation is certainly met when a landowner of condemned property is placed in as good a financial position as if his property had not been taken, *see United States v. 564.54 Acres of Land*, 441 U.S. 506, 510, 99 S.Ct. 1854, 1857, 60 L.Ed.2d 435 (1979), the United States Supreme Court has never construed this as a minimum constitutional requirement. To the contrary, the Fifth Amendment's requirement of just compensation has evolved into

a rule that requires only the payment of fair market value for the condemned property, even when fair market value may not fully compensate the landowner for all economic losses. 441 U.S. at 511, 99 S.Ct. at 1857. Clearly there will be cases when, after accounting for depreciation of buildings on a tract of land, fair market value will not be sufficient to allow their replacement with new facilities. However, the Supreme Court has specifically held:

> [N]ontransferable values arising from the owner's unique need for the property are not compensable and ... this divergence from full indemnification does not violate the Fifth Amendment.

441 U.S. at 514, 99 S.Ct. at 1851. The fair market value standard represents an attempt to achieve a workable rule that seeks a rough balance between the interests of the landowner and the interests of the taxpaying public. The standard therefore attempts to determine "What compensation is 'just' both to an owner whose property is taken and to the public that must pay the bill?" *See United States v. Commodities Trading Corp.*, 339 U.S. 121, 123, 70 S.Ct. 547, 549, 94 L.Ed. 707 (1950) (emphasis added); *see also 564.54 Acres*, 441 U.S. at 512, 99 S.Ct. at 1857 (market value concept chosen to "strike a fair 'balance between the public's need and the claimant's loss' ").

As a general rule, then, just compensation means the market value of the property on the date it was appropriated. *See 50 Acres of Land*, 469 U.S. at 29, 105 S.Ct. at 454. In *State v. Carpenter*, 126 Tex. 604, 609, 89 S.W.2d 194, 197 (1936), we held that when only a part of the land is taken the "just compensation" to which the owner is entitled consists of two elements: 1) the market value of the part taken, and 2) the damage to the remainder due to the taking and construction of the improvement for which it was taken. 89 S.W.2d at 197. We recently reaffirmed the vitality of the *Carpenter* standard in *State v. Windham*, 837

---

*tion in Texas,* 17 Baylor L.Rev. 168, 173–74 (1965).

**1.** The Texas constitution's analogue is article I, § 17, which provides: "[n]o person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person...." Tex. Const. art. I, § 17.

S.W.2d 73 (Tex.1992); *see also Uselton v. State*, 499 S.W.2d 92, 97–98 (Tex.1973); *City of Pearland v. Alexander*, 483 S.W.2d 244, 247 (Tex.1972); *State v. Walker*, 441 S.W.2d 168, 175 (Tex.1969); *City of Austin v. Cannizzo*, 153 Tex. 324, 329, 267 S.W.2d 808, 812 (1954). Deviation from the market value measure of just compensation is required only when determination of market value is impracticable or when its application would result in manifest injustice to the owner or to the public. *50 Acres of Land*, 469 U.S. at 29, 105 S.Ct. at 455.

Duchesne argues that its circumstances qualify under each of these exceptions to the market value standard and thus, the use of the substitute facilities doctrine is necessary. Under the first exception, Duchesne argues that deviation from the market value measure is necessary since its property had "no market value." As the court properly points out, the property in this case has a market value—one that can be calculated under the cost approach to determining market value advocated by the City, as opposed to the market data approach. Thus, I perceive of no reason why the market value standard cannot be successfully utilized in this case. Admittedly, application of that standard may result in less compensation than would be available under the substitute facilities doctrine, but that by itself does not compel a conclusion that the market value standard fails to meet constitutional requirements here.

Under the second exception, Duchesne argues that the application of the market value standard would result in manifest injustice. I disagree. Even though the City could have, it did not urge a right to pay for only the depreciated value of Duchesne's buildings. In fact, the City took the position at trial that it would pay for the undepreciated replacement cost of Duchesne's buildings.

But just as significantly, Duchesne does not have a right to compensation sufficient

to rebuild its new facilities on a tract adjacent to its current campus at a cost of $12,055,470. Although alternative locations may not be as desirable for a multitude of reasons, the requirement of just compensation does not require that the condemnee be allowed to unilaterally designate the tract of land upon which it will rebuild. To so hold would destroy any semblance of the balance the law seeks to achieve between public and private interests under these circumstances.

In summary, we are bound by a general rule of market value that balances the public's need and the landowner's loss in a workable manner, and in a way that achieves just compensation. However, I would not, as the court appears to do, close the door to the possibility that market value might not in all cases meet constitutional requirements; I would leave that door open. If we were presented with another case in which market value failed to satisfy constitutional standards of compensation, I would consider the application of the substitute facilities doctrine, regardless of whether the condemnee is a public or private entity. Accordingly, I concur in the court's judgment.

GONZALEZ, Justice, dissenting.

This is a simple condemnation case made complex and confusing by today's majority opinion. The City of Houston condemned a portion of a private school's property, owned by an order of Catholic nuns, in order to extend a major thoroughfare. The only question for the jury to decide was the proper amount of just compensation required to restore the school to its original pre-taking utility. After a three week trial, during which 23 experts testified, the trial court submitted to the jury one broad form question which inquired as to what amount would justly and reasonably compensate the condemnee.[1] The jury answered: $18,-451,398. The City did not complain in its

---

1. The question read:
   What do you find from a preponderance of the evidence was the **reasonable** cost on February 18, 1988, of land, if any, and improvements, if any, **reasonably necessary** to restore the remaining land and improvements at Du-

chesne Academy to substantially the same function and use that existed at Duchesne Academy before the City's taking of 1.479 acres of land and improvements thereon for construction and use of Chimney Rock Road? (emphasis added).

motion for new trial (nor does it now complain) that the verdict was excessive.[2]

The trial court did not submit a compensation question to the jury based on the **market value** measure of damages, because, as the City concedes, the property had *no ascertainable market value.* Both the Duchesne Academy and the City had proposed alternative compensatory standards to the trial court; neither relied on the market value test. Today, however, the Court second guesses the jury, sends the parties back to the trial court for another trial, and adopts an absolute rule that the market value method of compensation must be used in all condemnation cases, even if a property cannot be valued by the market value approach. In so doing, the Court misreads the United States Supreme Court's opinions regarding the substitute facilities doctrine. Further, it makes an impermissible distinction between public and private condemnees and ignores Texas precedent by abolishing the substitute facilities doctrine as an alternative remedy for condemnees in Texas.[3]

The court of appeals held that the jury's award conferred a "windfall on Duchesne because it included the cost to acquire land adjoining the school campus." 811 S.W.2d at 738–39. The trial court, however, instructed the jury to consider the cost of land *reasonably necessary* to restore the campus to its pre-condemnation use and utility. By including the cost of the adjacent land, the jury determined that the land was required to restore the campus to its pre-taking utility.[4] Thus, there is no windfall, because the fact-finder deemed the acquisition of adjacent land reasonably necessary to make Duchesne whole.

The "cost to cure" measure of compensation urged by the City differs from the "cost to cure" definition adopted by the court of appeals. The City's experts defined cost to cure as "the cost to return a property to its original functional utility." The court of appeals, however, disregarded this definition and adopted its own, defining cost to cure as "an appraisal technique used to arrive at the taken property's market value and the diminished market value of the remainder, which included the cost to replace improvements taken, damaged,

---

**2.** The City did not pray for remittitur in its motion for new trial. During the hearing on the motion, the trial judge asked City's counsel, "[I]f I reduce it from $18 million to $12 million, I would have to draw a judgment on that. Aren't you asking to have it reduced?" The City's counsel replied, "No, your honor."

**3.** Throughout the opinion, the Court emphasizes that Duchesne is a **"private"** school. One cannot help but get the impression that if this were a **"public"** school, the court would re-instate the jury verdict. Yet such a distinction is unconstitutional.

The court of appeals justified its decision on the basis that "the institutional objectives [of private schools] ... may not correspond with community needs." 811 S.W.2d at 738. I disagree. Accredited private schools serve a useful public purpose. They provide an excellent education, in which students are taught about God and moral values, respect for self and others, responsibility and discipline, without fear or apology. They also serve to relieve the overcrowding in public schools. As a consequence, private schools allow for more tax dollars per child to be spent in public schools. Thus, contrary to the court of appeals' opinion, the institutional objectives and continued existence of these private institutions are not inimical to community values and needs.

The court of appeals' suggestion that private schools are not legally obligated to spend compensation recovered in a condemnation proceeding—implying that they could take the money and run—does not justify treating them differently. In condemnation law, there is nothing that obligates any condemnee, whether public or private, to spend a compensatory award in any prescribed fashion. As the United States Supreme Court noted in *United States v. 50 Acres of Land,* 469 U.S. 24, 34, 105 S.Ct. 451, 457, 83 L.Ed.2d 376 (1984) the:

> obligation [of public condemnees] to replace a condemned facility ... is no more compelling than the obligations assumed by private citizens. Even though most private condemnees are not legally obligated to replace property taken by the Government, economic circumstances often force them to do so.... [There is no justification for] a distinction between public and private condemnees for the purpose of measuring "just compensation."

**4.** The City did not challenge the factual or legal sufficiency of the evidence supporting the jury's verdict. Thus, the fact that acquiring the adjacent land was necessary to restore Duchesne to its original utility is conclusively established for purposes of this appeal. *Vawter v. Garvey,* 786 S.W.2d 263, 264 (Tex.1990).

or destroyed, **after they have been appropriately depreciated.**" 811 S.W.2d at 739. However, none of the City's appraisers considered depreciation to be a factor in determining the amount of just compensation. Thus, the court of appeals apparently confused the "cost approach" for deriving market value with the "cost to cure," a method for determining damages to the remainder.

The City persuaded the court of appeals into believing that the substitute facilities doctrine no longer exists, and thus the court reversed the trial court's judgment, an error which this Court now affirms by saying that substitute facilities is a "waning doctrine." At 610. Recent opinions of the United States Supreme Court indicate that the substitute facilities doctrine is quite viable, and that a condemned tract potentially may have no market value. For all of the above reasons, I dissent.

## I.

What remains of Duchesne Academy now sits wedged into the intersection of Memorial Drive and Chimney Rock Road, two major thoroughfares in the City of Houston. The partial taking destroyed the school's chapel, day-care facility, lower school playground, major entrance and drive, and largest parking lot. The City and the school agreed that full restoration of the school's pre-taking utility required replacement of these demolished facilities. The City also conceded that it would have to restore or replace all the buildings on the remainder that had been damaged by the taking.

At trial, the City argued that the remainder provided sufficient land upon which to reconstruct the damaged or demolished school buildings, but the school disagreed urging that additional adjacent land was required. Duchesne demonstrated through extensive and varied expert testimony that air and noise pollution would so severely afflict the eastern half of the remainder so as to render it unusable for educational purposes. The City's architect agreed that noise pollution from Chimney Rock Road would have a serious impact on the fine arts building and the lower school building. He also noted that the lower school building, which was not taken, would need to be replaced because of its close proximity to the extended Chimney Rock Road. And the fine arts building, which now sits 5.5 feet from Chimney Rock, has suffered, as the City admitted, extensive damage which requires significant repair.

The City's flawed design of Chimney Rock further exacerbates the disruptively intrusive effects the boulevard's traffic flow will have upon Duchesne's educational environment. The City's design originally anticipated a use-level at 20,000 vehicles per day. Chimney Rock's current capacity, however, is approximately 38,000 vehicles per day. Thus, the road's present use already exceeds its originally projected capacity. Further, the evidence at trial conclusively demonstrated that the City failed to meet its own prescribed minimum requirements regarding the following essential elements of road design: (1) angle of intersection; (2) intersection sight distance; (3) radius of curve; (4) width of right of way; (5) width of pavement; (6) width of median; (7) width of shoulder; and (8) setback distance. An expert with 20 years experience in road design testified that the Chimney Rock extension was the worst "design of any modern day design [he has] ever seen anywhere." The bottom line is that these defects contributed to the creation of a continuing threat to the students' physical well-being on what remains of Duchesne's campus.

The City consented to replace a substantial number of the school's original buildings with new facilities, acknowledging that the standard market value approach to measuring damages could not apply because the school had no market value.[5]

---

5. The Court mistakenly asserts that the City argued for the "market value test" at trial and provided an accepted alternative measure for ascertaining that market value. At 615. The record does not support this assertion. The City and Duchesne agreed that the school was a special purpose property which was not bought and sold on the market place and thus had no

The City submitted a "cost to cure" measure of damages that contemplated the demolition and reconstruction or repair of the damaged buildings within the confines of the remainder. Duchesne, contending that the remainder could not sufficiently accommodate the City's approach, submitted a substitute facilities measure of damages, which anticipated acquiring adjacent property. Thus, the key question for the jury was whether restoring the school to its original utility required the purchase of additional land.

## II.

The Texas and United States Constitutions guarantee landowners just and adequate compensation for any governmental taking.[6] In Texas, compensating a condemnee usually involves paying an amount equal to the market value of the land taken plus the difference between the market value of the remainder before and after the taking. See, e.g., *State v. Windham*, 837 S.W.2d 73 (Tex.1992); *Callejo v. Brazos Elec. Power Coop., Inc.*, 755 S.W.2d 73, 76 (Tex.1988); *State v. Carpenter*, 126 Tex. 604, 89 S.W.2d 979, 980 (1936) (on motion for rehearing). Determining the market value thus is essential to applying the standard compensation method.

Market value is "the price the property will bring when offered for sale by one who desires to buy, but is under no necessity of buying." *Carpenter*, 89 S.W.2d at 197, 201–02. This Court recognized in *Carpenter* the potential need for alternative measures of just and adequate compensation in takings cases, stating that market value compensation "cannot be reached in every case by following the general rules [of market value compensation] here outlined." *Id.* at 201–02. We later approved of a definition of market value in *City of Austin v. Canizzo*, 153 Tex. 324, 267 S.W.2d 808 (1954), which clarified how juries should determine a condemned proper-

ty's market value. That definition reads as follows:

> the term 'market value' is the price which the property would bring when it is offered for sale by one who desires but is not obliged to sell, and is bought by one who is under no necessity of buying, taking into consideration all of the uses to which it is reasonably adaptable and for which it either is or in all reasonable probability will become available within the reasonable future.

*Id.*, 267 S.W.2d at 815; *see also United States v. Miller*, 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943) (market value of condemned property is what a willing buyer would pay a willing seller); *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934) (purpose of Just Compensation Clause is to put condemnee "in as good a position pecuniarily as if his property had not been taken"); *cf. United States v. Cors*, 337 U.S. 325, 332, 69 S.Ct. 1086, 1090, 93 L.Ed. 1392 (1948) (Court "refused to make a fetish even of market value, since that may not be the best measure of value in some cases").

The Court lists in its opinion four approaches used in Texas for compensating condemnees, citing as authority a treatise by Judge Madison Rayburn, who also filed an amicus brief in this case supporting Duchesne's position. At 616. The Court's list omits by ellipsis some language essential to understanding these approaches. In full, as they appear in Judge Rayburn's treatise, they are:

(1) Comparative market sales;

(2) Replacement cost less depreciation, *or otherwise stated as giving a reasonable equivalent by substitution, reconstruction, removal, re-establishment or re-erection;*

(3) Capitalization of income, *or economic approach, using the ordinary, prudent*

---

market value under the accepted test. Consequently, some alternative measure of damages was necessary.

**6.** The United States Constitution provides that no private property shall "be taken for public

use, without just compensation." U.S. CONST. amend. V. The Texas Constitution says that "[n]o person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made." TEX. CONST. art. I, § 17.

*business man and his economic practices or customs; and*

(4) Real, actual or intrinsic value, *to some extent included in some of the items heretofore mentioned, but which might include value to the individual involved that would be special to him, such as the actual value of a phosphate quarry to a fertilizer manufacturer that was adjoining.*

At 616 *citing* 1 RAYBURN ON CONDEMNATION § 16.00 (1987) (emphasis added to omitted language).[7]

Approach (2) is broader than the standard "cost approach" in that it conceives of a cure "by substitution, reconstruction, removal, re-establishment or re-erection." *Cf.* THE APPRAISAL OF REAL ESTATE 349 (9th ed. 1987) (discussing standard cost). The scope of this approach subsumes the substitute facilities measure. Approach (4) also is relevant, because it recognizes that the "real, actual or intrinsic value" of a condemned tract "might include value to the individual involved that would be special to him." This cuts against applying the standard market value measure, as interpreted by the Court, which seeks to obviate the influence of particular uses or values in assessing damages. *See* R.A. EPSTEIN, TAKINGS: PRIVATE PROPERTY AND THE POWER OF EMINENT DOMAIN 183 (1985) ("[t]he central difficulty of the market val-

ue formula for explicit compensation, therefore, is that it denies any compensation for real but subjective values"); Laura H. Burney, *Just Compensation and the Condemnation of Future Interest: Empirical Evidence of the Failure of Market Value,* 1989 B.Y.U.L.REV. 789, 790 (1989) ("the fair market value standard has assumed the position of the pagan god of just compensation despite the protest of heretics promoting economic efficiency and fairness"). *See generally* J.G. Durham, *Efficient Just Compensation as a Limit on Eminent Domain,* 69 U.MINN.L.REV. 1277, 1278–79 (1985) (just compensation requirement is essential check on eminent domain powers because market value "often does not adequately measure all the costs that the property owner" suffers).

### III.

The identifying features of a special purpose property are: (1) the property has physical features peculiar to its use; (2) the property has no apparent market; and (3) it has no feasible economic alternate use. J.D. EATON, REAL ESTATE VALUATION IN LITIGATION 162 (1982). As a registered nonprofit educational institution serving over 4,000 students, Duchesne is a special purpose property that is not frequently traded in the market place, and thus it has no market value.[8] If a special purpose proper-

---

7. Judge Rayburn filed one of seven amicus briefs supporting Duchesne. The Court attacks, in footnote 13 of its opinion, Judge Rayburn's position on the absence of market value by extracting a specific quotation from his treatise that appears to facially conflict with his brief. At 628 (citing 2 RAYBURN ON CONDEMNATION at § 19.01). The sentences preceding the quotation, however, provide some context. They say that the special purpose properties which are:

> peculiarly susceptible to being valued by the intrinsic method, are those of churches, institutions and public buildings. *Practically all* other property of a real character, in its final analysis has a ready market value, in addition to its intrinsic value, or worth.

2 RAYBURN ON CONDEMNATION § 19.01 (1987). (emphasis added); *cf. West Texas Hotel Co. v. City of El Paso,* 83 S.W.2d 772 (Tex.Civ.App.—El Paso 1935, writ dism'd) (intrinsic value of property determined by considering location, cost, improvements, use of property, expected future use). Judge Rayburn goes on to say that courts

can derive compensation for condemned special purpose properties by "allowing the introduction of evidence as to what it would cost to replace the buildings and improvements, less its present depreciation, and substitute a similar property...." 2 RAYBURN ON CONDEMNATION § 19.01 (1987). He also notes elsewhere in his treatise that "[w]here property, such as public or private school, has no market value capable of forming baseline by which to measure adequate compensation, trial court [w]as correct in submitting single issue of reasonable cost of acquiring substitute school facilities to jury." 1 *Id.* at § 1.14(8) (citing *State v. Waco Indep. School Dist.,* 364 S.W.2d 263, 264 (Tex.Civ.App.—Waco 1963, writ ref'd n.r.e.), and *City of San Antonio v. Congregation of the Sisters of Charity,* 404 S.W.2d 333 (Tex.Civ.App.—Eastland 1966, no writ)).

8. At trial, the City's chief appraiser testified that it is "general knowledge" that "schools are not sold in the open marketplace," and therefore "Duchesne ... would be classified as a special

ty like Duchesne is condemned, the absence of an ascertainable market value will require the use of an alternative remedy to ensure just compensation to the condemnee. *See, e.g., City of Meriden v. Highway Commissioner,* 169 Conn. 655, 363 A.2d 1094, 1097 (1975) ("[w]hen the property is of a kind seldom exchanged, however, it lacks a 'market price,' and recourse must be had to other methods of valuation"); *County of Cook v. City of Chicago,* 84 Ill.App.2d 301, 228 N.E.2d 183, 187 (1967) ("market value basis is not the legal standard for property taken when applied to a special use such as a church, college, cemetery, clubhouse, or terminal of a railroad") (citing *City of Chicago v. Farwell,* 286 Ill. 415, 121 N.E. 795 (1918); *City of Wichita v. Unified School Dist. No. 259,* 201 Kan. 110, 439 P.2d 162, 166 (1968) ("school houses ... are special purpose properties not ordinarily bandied about in the market place, and hence a test other than market value must be employed in ascertaining their worth"); *Commonwealth of Ky. v. City of Winchester,* 431 S.W.2d 707, 710 (Ky.App.1968) ("strict adherence to the time honored market value approach in all types of condemnation cases is not wise").

Despite ample authority to the contrary, the Court today disposes of the idea that a special purpose property has no market value; therefore, under the Court's analysis, the substitute facilities measure never could apply. The Court's discussion focuses upon the United States Supreme Court's most recent decisions in this area, namely, *United States v. 564.54 Acres of Land,* 441 U.S. 506, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979) ("*Lutheran Synod*") and *United States v. 50 Acres of Land,* 469 U.S. 24, 105 S.Ct. 451, 83 L.Ed.2d 376 (1984); but these cases do not support its conclusion. Further, they are factually distinguishable from the case now before us because *market value was established* in both cases.

In *Lutheran Synod,* the United States government condemned land that included a non-profit Lutheran summer camp. The Court refused to apply the substitute facili-

ties measure of damages, *because it found that the record contained evidence that the camp had a market value.* Specifically, the record revealed that similar camp properties previously had been bought and sold in the prevailing market. In fact, the jury found that the camp's market value was $740,000. *See Lutheran Synod,* 441 U.S. at 513 n. 8, 99 S.Ct. at 1858 n. 8. The Court thus refused to apply the substitute facilities doctrine because an ascertainable market value existed for the camp (and not because a private entity, as matter of law, cannot benefit from the doctrine).

In its opinion, this Court states that the Supreme Court was "[u]nable to ascertain [in *Lutheran Synod* ] any rationale requiring the suspension of the normal rules for determining just compensation" and thus "held that the fair market value measure applied." At 607. The normal rules call for applying the market value approach if market value is ascertainable. Since the record contained evidence that the camp had a market value, there was no need for the Supreme Court to find a rationale to apply an alternative measure of damages. Thus, it was the record in *Lutheran Synod,* and not the identity of the petitioning party, that led the Court to refuse to apply the substitute facilities doctrine. Additionally, this Court is incorrect in asserting that the Supreme Court rejected in *Lutheran Synod* the possibility that the doctrine could be applied to a non-profit private entity. At 611 n. 7. This repeats the error of focusing on the condemnee's identity rather than on whether a market value for the condemned tract exists.

In *50 Acres,* the Supreme Court again refused to apply the substitute facilities doctrine *because the record contained evidence that the condemned property in issue possessed a market value.* In assessing damages, the jury in *50 Acres* arrived at two figures, one calculating the market value for the condemned land, a city dump, and the other determining the cost of applying the substitute facilities doctrine. *Id.,* 469 U.S. at 28, 105 S.Ct. at

purpose property," a conclusion confirmed by

the City's other expert appraiser.

454. The city argued that the government was constitutionally compelled by the Just Compensation Clause to apply the substitute facilities doctrine, even though an ascertainable market value for the condemned land existed. The Supreme Court disagreed holding that the substitute facilities measure could not apply. The Court noted that:

> [t]his case is not one in which an exception to the normal measure of just compensation is required because fair market value is not ascertainable. Such cases, for the most part, involve properties that are seldom, if ever, sold in the open market. Under those circumstances, 'we cannot predict whether the prices previously paid, assuming there have been prior sales, would be repeated in a sale of the condemned property.' (citation omitted). In this case, however, the testimony at trial established a fairly robust market for sanitary landfill properties, (citation omitted), and the jury's determination of the fair market value of the condemned landfill facility is adequately supported by expert testimony concerning the sale prices of comparable property. (citations omitted).

*Id.* at 30, 105 S.Ct. at 455. Private schools in the City of Houston, like Duchesne, are "seldom, if ever, sold on the open market." Further, unlike the jury in *50 Acres*, the jury in this case did not find an ascertainable market value for the condemned property.

Rather than constricting the substitute facilities doctrine, *50 Acres* left open the possibility for its expansion. The Court observed that the constitutional mandate of just compensation could require a court to award damages based on substitute facilities, *even if an ascertainable market value exists*, if the condemnee can show that "payment of market value in a particular case is manifestly unjust and therefore inconsistent with the Just Compensation Clause." *50 Acres*, 469 U.S. at 37, 105 S.Ct. at 458 (O'Connor, J., concurring). This does not describe a "waning doctrine." At 610. In her concurrence in *50 Acres*,

Justice O'Connor admits to the possibility that a public condemnee could recover through the substitute facilities measure even if the record contained evidence of a market value for the condemned property. This unusual outcome could only occur if paying the condemnee the market value would "deviate[ ] significantly from the make-whole remedy intended by the Just Compensation Clause." 469 U.S. at 37, 105 S.Ct. at 459 (O'Connor, J., concurring).

Instead of analyzing the language in *50 Acres*, the Court simply "reject[s] Duchesne's contention that *50 Acres* somehow implies that the substitute facilities doctrine can be applied to takings of private property...." At 610. The relevant language in *50 Acres* reveals, however, that the substitute facilities measure of damages can be applied to private as well as public condemnees if no market value exists for the condemned land. But this Court now proposes that the market value measure *must always* provide the remedy for a damaged private condemnee, ignoring in the process precedent which established that some condemned tracts may not have an ascertainable market value. *See, e.g., State v. South Main Baptist Church*, 361 S.W.2d 898, 901 (Tex.Civ.App.—Houston 1962, writ ref'd n.r.e.) (jury found condemned land had no market value); *State v. Richardson*, 215 S.W.2d 359, 361 (Tex. Civ.App.—Eastland 1948, writ ref'd n.r.e.) (same); *City of Trinity v. McPhail*, 131 S.W.2d 803, 806 (Tex.Civ.App.—Galveston 1939, no writ) (market value test does not apply if "jury finds that property involved has no market value"); *see also City of Austin v. Cannizzo*, 153 Tex. 324, 267 S.W.2d 808, 812 (1954) ("where a property has no market value its intrinsic value may be shown").

### IV.

Today's opinion compounds the error the court of appeals made in concluding that "the substitute facilities measure is not intended to be applied to private landowning condemnees," because private condemnees, unlike public condemnees, are un-

der no "obligation to continue the function performed on the taken property." [9] 811 S.W.2d at 738. The United States Supreme Court abrogated this "public duty requirement" for the substitute facilities doctrine, probably because of inherent equal protection problems, when it said that the "obligation to maintain public services ... does not justify a distinction between public and private condemnees for the purpose of measuring just compensation." *50 Acres*, 469 U.S. at 34, 105 S.Ct. at 457. The Court went on to say that "[e]ven though most private condemnees are not legally obligated to replace property taken by the Government, economic circumstances often force them to do so." *Id.* Thus, a public condemnee's legal "obligation to replace a condemned facility ... is no more compelling than the obligations assumed by private citizens." *Id.; see also* Michael H. Schill, *Intergovernmental Takings and Just Compensation: A Question of Federalism*, 137 U.Pa.L.Rev. 629, 889 (1989) (arguing that Just Compensation Clause provides more protection from unfair burdens of takings for private condemnees than public).[10]

In light of this clear language, I do not understand how the Court can say that "nothing in *Lutheran Synod* or *50 Acres* supports the application of the substitute facilities doctrine to private schools." At 609. This statement is particularly inapposite given that the outcome in these two cases turned not on the plaintiffs' identities, but on the fact, as the Court admits, that the trial court's records in both cases contained evidence that the condemned

properties possessed market values. At 609.

A Texas court of appeals anticipated the United States Supreme Court's abandonment of the public/private distinction regarding takings' remedies. *See City of San Antonio v. Congregation of the Sisters of Charity*, 404 S.W.2d 333 (Tex.Civ. App.—Eastland 1966, no writ). In that case, the court said that the proper measure of damages for taking part of the land of a private school is the same as it is in like cases where land of a public school is taken. *Id.* at 337. That court also acknowledged the equal protection problems such distinctions might present. *Id.* at 335. *Sisters of Charity* progressed from the first application of the substitute facilities doctrine in Texas in *State v. Waco Indep. School Dist.*, 364 S.W.2d 263, 264 (Tex.Civ. App.—Waco 1963, writ ref'd n.r.e.) (applying doctrine to a public school). In allowing the purchase of adjacent land for school building reconstruction, the court in *Waco* stated that the purpose of the substitute facilities doctrine was to "restore the remainder of the campus to a utility equal to that which the campus had prior to the condemnation." *Waco*, 364 S.W.2d at 267. This language is relevant to the case at bar, because it precisely describes the City's purpose in arguing for the "cost to cure" measure. *Cf. Board of Educ. v. Commonwealth*, 528 S.W.2d 657, 658 (Ky. App.1975) (construed substitute facilities measure applied in *Waco* to include "cost to cure"); *see also City of Tulsa v. Mingo School Dist. No. 16*, 559 P.2d 487, 494 (Okla.App.1976) (estimating restoration cost of demolished buildings amounted to

---

9. The City agreed during voir dire that such public/private distinctions were impermissible.
   Counsel for Duchesne: [W]e think that it may be the City's position that they will treat private schools differently than public schools; and if that's wrong, [City's counsel] can tell me I'm wrong right now.
   Counsel for City: Well, yes, you are wrong. I say that everybody, under the Constitution, is entitled to equal treatment....

10. The Court noted that:
   [t]he text of the Fifth Amendment certainly does not mandate a more favorable rule of compensation for public condemnees than for

private parties. To the contrary, the language of the Amendment only refers to compensation for "private property," and one might argue that *the Framers intended to provide greater protection for the interests of private parties than for public condemnees.* That argument would be supported by the observation that many public condemnees have the power of eminent domain, and thus, unlike private parties, need not rely on the availability of property on the market in acquiring substitute facilities.
*50 Acres*, 469 U.S. at 31, 105 S.Ct. at 455 (emphasis added).

applying substitute facilities measure).[11] Thus, Texas precedent, as well as the United States Supreme Court's most recent writing on the subject, supports the manner in which the trial court applied the substitute facilities/"cost to cure" measure.

## V.

The Court's opinion neither presents nor analyzes the principal issue in this case, namely, whether the substitute facilities measure of damages, as applied here, could include the acquiring of adjacent land. The City framed its objection to the substitute facilities' part of the jury charge by complaining about this potential acquisition. The City's counsel noted that the:

> City of Houston objects because only the cost to cure limited to the remainder can be considered, and Question 1 allows the Jury to consider the cost of acquiring the adjoining 7.91 acres known as the Memorial Creole apartments as a substitute facilities (sic).

The City's objection reveals that the focus of this dispute rested on whether acquisition of adjacent land was necessary to restore Duchesne's original utility. The jury affirmatively answered this fact question. The City's refusal to include adjacent land in its proposed remedy is thus the only substantive difference between the "cost to cure" measure and Duchesne's substitute facilities measure.

The City's chief appraiser implicitly identified the City's "cost to cure" proposal with substitute facilities when he noted that the City's restoration plans would provide "bigger and better buildings" which were "vastly superior ... by millions of dollars" to the old buildings. He emphasized that the new facilities would be "worth ten times more than existing buildings." He even went so far as to testify that the "cost to cure," under other circumstances, could include acquiring adjacent property, if such acquisition was needed to restore the condemned land to its original utility. This testimony echoed what the City's counsel told the jury during voir dire, when he said that the City intended to provide Duchesne with "a better facility than [Duchesne] had previously."

By equating the "cost to cure" with the "cost approach," the Court repeats the error made by the court of appeals. 811 S.W.2d at 738–39. The former is a method for measuring damages to a remainder in terms of the cost to repair or restore; the latter is a way to determine the market value of a condemned tract when no market data or comparable sales exist. The cost approach requires separate valuation of the land and improvements less depreciation. *See* THE APPRAISAL OF REAL ESTATE 349 (9th ed. 1987). The City did not obtain these separate valuations, probably because it recognized that the remainder had no market value; and it did not adduce any evidence as to depreciation, an essential element of the cost approach. Thus, the Court's discussion of this method of valuation is not relevant.[12]

---

11. *City of Tulsa v. Mingo School Dist. No. 16* resembles the case before us in several important ways. It also involved the partial taking of a school's property for a motor way, the noise from which, upon completion and use, degraded the school's educational environment. The trial court properly applied the substitute facilities doctrine to restore the school to its original utility by refurbishing the structures with soundproofing. As in our case, the city agreed at trial that the school had no market value, but then urged on appeal that the market value test should be used. 559 P.2d at 493. The court of appeals found the city's position untenable in light of the record and recognized the need for an alternative measure of compensation. The court noted that:

> [t]he courts in the majority of jurisdictions which have dealt with this problem have responded to the need for a substitute to the usual market value approach to compensation by adopting special rules for both the measure of compensation and the evidence admissible in condemnation proceedings involving special purpose property.

*Id.*

12. The cost approach is most useful for valuing condemned property "when the land value is well supported and the improvements are new or suffer only minor accrued depreciation...." *Id.* Neither of these prerequisites exist in this case, which may account for the City's failure to invoke it. Furthermore, "[w]hen value estimates derived with the cost approach are not supported by market data, they must be regarded with caution." *See* THE APPRAISAL OF REAL ESTATE 350 (9th ed. 1987). Indeed, "the cost

The City did ask for a partial remedy based on the "cost to cure" the remainder. *See* 4 NICHOLS ON EMINENT DOMAIN § 12B.11[1] (3rd ed. 1987) (cost to cure is method for measuring damages to remainder caused by partial taking of special purpose property where damaged property can be restored by repair or reconstruction). The "cost to cure" measure, as developed by the City, resembled Duchesne's substitute facilities measure in that the City anticipated removing damaged buildings and reconstructing new and improved facilities on the remaining portion of Duchesne's campus. The "cost to cure" and substitute facilities measures are similar but "[t]he cost of reproduction refers to the cost of duplication with the same or similar materials and appearance, and is not necessarily the same as the cost of replacement, which is considered a substitute or equally functional facility." *See* 4 NICHOLS ON EMINENT DOMAIN § 12B.11[3] (3rd ed. 1987) (discussing Model Eminent Domain Code on cost of reproduction).

One key distinction between "cost to cure" and substitute facilities is that the former confines its remedy to the remainder. *See St. Patrick's Church v. State of N.Y.*, 30 A.D.2d 473, 294 N.Y.S.2d 275, 277 (1986)) (citing NICHOLS) ("cost to cure" allowed "because cure was to occur *within* the bounds of the claimant's lands"). If full restoration of the condemnee's property requires "action outside of the remainder tract, this restoration cost, or cost to cure, cannot be considered." J.D. EATON, REAL ESTATE VALUATION IN LITIGATION 180 (1982). Yet the "cost to cure" and substi-

tute facilities measures both conceive of restoring the damaged condemnee's property with new construction. The City proposed a hybrid, agreeing to replace Duchesne's damaged facilities with better ones (going beyond "cost to cure") but refusing to agree to the acquisition of adjacent land (falling short of substitute facilities).

The City specifically pleaded that it would provide replacement facilities of greater value than existed before the taking. Rather than simply estimating the costs of reproducing or repairing those facilities damaged or destroyed by the taking, the City instead proposed to replace them. By offering to restore the campus in a way that substantially would enhance Duchesne's worth, the City submitted a remedy that can best be categorized as a substitution facilities measure of damages. Hence, the trial court properly permitted the jury to decide the real question in this case, namely, whether restoring Duchesne School to its original utility required the acquisition of adjacent land.[13] Considering all of these factors, particularly the noise and air pollution generated by 38,000 vehicles per day, the proximity of the road to existing buildings and the flawed design of the roadway, I do not believe that the submitted issue was defective.

## VI.

Since the trial court properly applied the substitute facilities doctrine, the issue of whether the City waived application of the market value measure by failing to preserve error is not relevant. Nonetheless,

---

approach may be of limited effectiveness in valuing improved property." *Id.*

**13.** In footnote 10 of its opinion, the Court distinguishes the substitute facilities doctrine from the "cost to cure" measure by citing NICHOLS ON EMINENT DOMAIN which says that "the cost approach has been used in lieu of the substitution approach so that depreciation may be taken into account. *Also, damages to improvements on the remaining property have been recognized, usually in the form of cost to cure.*" (emphasis added in majority opinion). 4 NICHOLS ON EMINENT DOMAIN § 12C.01[4][e] (3d ed. 1987). NICHOLS distinguishes between the cost approach and the "cost to cure," but the Court treats them as different names for the same concept. The

City's "cost to cure" measure contemplated not just recompense for damaged buildings on the remainder, but the removal and reconstruction of damaged or destroyed buildings; that is, the construction of substitute facilities which would be worth substantially more than the original buildings. The Court cites NICHOLS again in the same footnote for the proposition that the proper measure of damages for a partial taking of a special purpose property is the market value measure (value of tract taken plus loss in value of remainder). I agree that this measure should apply when the tract in issue has a market value; but the parties to this suit agreed that Duchesne has no market value.

since the Court remands this cause for a new trial, a brief discussion of the issues submitted by the City is appropriate.

The City submitted two questions and instructions that attempted to invoke the market value test.[14] The City's submissions are not in "substantially correct" form as required by TEX.R.CIV.P. 278, because they failed to properly provide the market value test as prescribed by *State v. Carpenter* and its progeny. That is, the City failed to include in its measure of damages the amount of loss derived from the value of the remainder before the taking less its value after the taking. More to the point, the trial court properly refused the question, because the City had already acknowledged during the trial that Duchesne was a *special purpose* property for which no willing seller or willing buyer existed. Allowing these questions and instructions would be inconsistent with the City's testimony.

The trial court recognized that this special case required an alternative measure of compensation. Both the City and Duchesne argued for measures that contemplated the replacement of Duchesne's taken or damaged buildings with new facilities. Thus, even if the substitute facilities measure did not apply, the market value method could not apply because, as the City concedes, the property has no ascertainable market value.

## VII.

"The just compensation to which an owner is entitled when his property is taken by eminent domain is regarded in law from the point of view of the owner and not the condemnor. In other words, just compensation in the constitutional sense is what the owner has lost, and not what the condemnor has gained." 3 NICHOLS ON EMINENT DOMAIN § 8.61 (3rd ed. 1987); *see also Northern Natural Gas Co. v. Johnson*, 278 S.W.2d 410 (Tex.Civ.App.—Amarillo 1954, writ ref'd n.r.e.); *cf. City of Meriden v. Highway Commissioner*, 169 Conn. 655, 363 A.2d 1094, 1097 (1975) (substitute facilities doctrine "has no true relationship to 'valuation,' but is instead a measure of just 'compensation'").

The City of Houston obtained a benefit through this condemnation process, namely, the new Chimney Rock extension. But Duchesne lost a great deal of its original capacity to provide an effective and safe learning environment to its 4000–plus students. Just compensation requires the City to make Duchesne whole by restoring that lost capacity.

I agree with the Court that the market value test should guide the measuring of compensation for partial takings of special purpose properties but only *when some market value for the property is ascer-*

14. The City's two refused questions and instructions read:

QUESTION NO. ONE
FROM A PREPONDERANCE OF THE EVIDENCE, WHAT DO YOU FIND WAS THE MARKET VALUE OF THE LAND CONDEMNED BY THE CITY OF HOUSTON FROM THE RELIGIOUS OF THE SACRED HEART OF TEXAS ON FEB. 18, 1988, CONSIDERED AS SEVERED LAND?
ANSWER: $_____
INSTRUCTION:
YOU ARE INSTRUCTED THAT THE TERM "MARKET VALUE" IS THE PRICE WHICH THE PROPERTY WOULD BRING WHEN IT IS OFFERED FOR SALE BY ONE WHO DESIRES, BUT IS NOT OBLIGED TO SELL, AND IS BOUGHT BY ONE WHO IS UNDER NO NECESSITY OF BUYING IT, TAKING INTO CONSIDERATION ALL OF THE USES TO WHICH IT IS REASONABLY ADAPTABLE AND FOR WHICH IT EITHER IS OR IN ALL REASONABLE PROBABILITY WILL BE-

COME AVAILABLE WITHIN THE REASONABLE FUTURE.
QUESTION NO. TWO
WHAT DO YOU FIND WAS THE DAMAGES (sic), IF ANY, TO THE REMAINDER OF THEIR PROPERTY, EXCLUDING THE LAND CONDEMNED, RESULTING FROM THE CONDEMNATION OF THE LAND CONDEMNED, ON FEB. 18, 1988.
ANSWER: $_____
INSTRUCTION:
IN ANSWERING QUESTION NO. TWO, YOU SHALL EXCLUDE INCREASE IN VALUE, IF ANY, AND DECREASE IN VALUE, IF ANY, BY REASON OF BENEFITS OR INJURIES RECEIVED BY RELIGIOUS OF THE SACRED HEART IN TEXAS IN COMMON WITH THE COMMUNITION (sic) GENERALLY, AND NOT PECULIAR TO IT IN CONNECTION WITH ITS OWNERSHIP, USE, AND ENJOYMENT OF THEIR REMAINING PROPERTY.

*tainable.* At 617; *see also* 1 RAYBURN ON CONDEMNATION § 16.04 (1987). In the rare case when no market value exists, courts must resort to alternative measures of compensation such as the substitute facilities doctrine. That is precisely what happened in this case. In its opinion, the Court says that "[a]lthough presenting unique and sympathetic facts, this case does not justify a departure from the market value concept." At 617. If this very unique situation does not merit application of the substitute facilities doctrine, then no case will. The Court's abrogation of the substitute facilities doctrine has some serious constitutional implications, because it deprives the citizens of Texas of a method of Just Compensation which the United States Supreme Court recently recognized as viable in *50 Acres.* Thus, I would not be surprised if today's decision is subjected to further federal review.

Disregarding our dispute over the applicability of the substitute facilities doctrine, the Court nevertheless should uphold the jury's verdict. The trial court submitted the question to the jury in broad form. *See* TEX.R.CIV.P. 277 ("[i]n all jury cases the court shall, whenever feasible, submit the cause upon broad-form questions"). Neither the question nor the written instructions referred to the "substitute facilities" or "cost to cure" measures of damages. *Cf. Department of Highways & Public Trans. v. King,* 795 S.W.2d 888, 894 (Tex. App.—Beaumont 1990) *writ denied per curiam* 808 S.W.2d 465 (Tex.1991) ("trial court given broad discretion in determining sufficiency of instructions and definitions"). We previously have said "that trial courts are permitted, even urged, to submit the controlling issues of a case in broad terms so as to simplify the jury's chore." *Texas Dept. of Human Services v. E.B.,* 802 S.W.2d 647, 649 (Tex.1990). Here, the trial judge properly followed that directive, giving to the jury, without complication, an acceptable broad issue on just compensation. He appropriately recognized that the jury, having engaged in a three week in-depth education on all the aspects of this case, was best qualified to

ascertain what amount would justly make Duchesne whole; that is, what amount would achieve both the City's and Duchesne's collective goal of restoring the school to its original pre-taking utility. Thus, he submitted a single question that broadly asked exactly that.

In my opinion, the court of appeals erred in reversing the trial court's judgment based on the invalidity of substitute facilities doctrine, because the court's broad form submission did not prescribe what basis—whether substitute facilities, cost to cure, or market value—the jury should use to reach its result. Additionally, this Court has denied Duchesne the just compensation it received when the trial court properly submitted the case to the jury. Thus, I dissent.

COOK, J., joins this opinion.

COOK, Justice, dissenting.

I join in the dissenting opinion of Justice Gonzalez but write separately to express my own views. The majority opinion forecloses use of the substitute facilities doctrine in any condemnation case in this state in which private property is taken. I do not believe the United States Supreme Court has taken this step in cases involving the taking of private property. I believe the doctrine can be successfully applied in this case under generally accepted appraisal principles.

Religious of the Sacred Heart d/b/a Duchesne Academy (Duchesne), one of the finest schools in the state, had a road placed entirely within the campus. Duchesne argues that because its property had "no market value," the substitute facilities doctrine applies and entitles Duchesne to the cost of acquiring adjacent land.

In determining adequate compensation under the Texas Constitution, we must determine a property's market value. This court and the appraisal profession have recognized three methods of determining a property's market value. *See generally City of Austin v. Cannizzo,* 153 Tex. 324, 267 S.W.2d 808 (Tex.1954). Simply because a property is not "sold in the marketplace,"

a fact the City admits, does not lead to the conclusion that it has "no market value." *Id.* In such a situation, the result is that the "market data approach" to determining "market value" cannot be utilized. Consequently, one of the other approaches to determining market value, either the cost approach or the income approach, must be utilized. The majority opinion correctly analyzes these principles.

My divergence with the majority comes with its holding that the United States Supreme Court has foreclosed application of the substitute facilities doctrine in condemnation actions involving the taking of private property. *See generally United States v. 564.54 Acres of Land,* 441 U.S. 506, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979) ("*Lutheran Synod*"); *United States v. 50 Acres of Land,* 469 U.S. 24, 105 S.Ct. 451, 83 L.Ed.2d 376 (1984). I do not read the Supreme Court's cases so narrowly. I would hold that in condemnation cases involving the taking of special purpose properties for which there are no comparable sales, the cost approach allows the price of substitute facilities to be considered in determining the ultimate issue of market value.

This is precisely the question submitted to the jury in this case. The judgment of the trial court should be affirmed.