

**NUMBER 13-02-237-CV**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

COASTAL LIQUIDS PARTNERS, L.P.,                          Appellant,

v.

MATAGORDA COUNTY APPRAISAL DISTRICT,                    Appellee.

On appeal from the 130th District Court of Matagorda County, Texas.

# MEMORANDUM OPINION ON REMAND

### Before Justices Yañez, Garza, and Benavides
### Memorandum Opinion On Remand by Justice Benavides

In our original opinion in this case, we held that underground salt caverns in which natural gas is stored could not be appraised and taxed separately from the surface land above them. *Coastal Liquids Partners, L.P. v. Matagorda County Appraisal Dist.*, 118 S.W.3d 464, 469 (Tex. App.–Corpus Christi 2003), *rev'd and remanded*, 165 S.W.3d 329, 336 (Tex. 2005). The Texas Supreme Court reversed, holding that the caverns were "improvements" which could be valued separately, and remanded to us to address the

remaining issues. *See Matagorda County*, 165 S.W.3d at 336. We now address whether there is sufficient evidence to uphold the appraisal values reached by the trial court. We affirm.

## I. FACTUAL BACKGROUND

Two underground salt caverns in Matagorda County, Texas are at issue in this case.[1] The two salt caverns have relatively impermeable and durable walls; therefore, like many caverns along the Texas Gulf Coast, they are used to store natural gas. One cavern, called Hiltpold #1, is owned by Texas Brine Corporation ("Texas Brine"); the second cavern, called Hudson #3, is owned by Lawrence J. Peterson and is leased by Texas Brine. Both caverns, in turn, are leased by the appellant, Coastal Liquids Partners, L.P. ("Coastal"). Under the leasing contract between Coastal and Texas Brine, Coastal assumed responsibility for ad valorem taxes owed to the appellee, the Matagorda County Appraisal District ("the District").[2]

In order to assess the property taxes, the District needed to ascertain the market value of the caverns. *See* TEX. TAX CODE ANN. § 23.01(a) (Vernon 2008). The District hired Pritchard & Abbott ("P&A"), an engineering firm in Austin, Texas, to conduct an appraisal. For each of the years from 1996 to 1999, P&A appraised Hiltpold #1 at

---

[1] The two caverns are part of a hydrocarbon storage facility in Matagorda County known as the Markham Facility. In total, the facility contains fourteen caverns, seven of which are used for hydrocarbon storage. Only two of the caverns are at issue in this appeal.

[2] The contract read that Coastal was responsible for "ad valorem taxes applicable to Coastal's products stored and Coastal's product handling facilities and taxes applicable to the well storage capacity specifically related to Coastal's storage." Originally, the space within the caverns was insufficient to meet Coastal's capacity needs, so Texas Brine leached salt off the cavern walls in order to increase the amount of storage space. The leaching process added a capacity of 2.5 million barrels to Hiltpold #1 and 1.9 million barrels to Hudson #3. It was this "improvement"—the expansion of capacity—that led to the assessment of ad valorem taxes.

$1,525,000 and Hudson #3 at $815,000. To calculate these figures, P&A applied the "cost method," an appraisal method that is commonly used throughout the United States and specifically recognized in Texas by statute. *See id.* § 23.011 (Vernon 2008).[3] The cost method involves "a set of procedures through which a value indication is derived . . . by estimating the current cost to construct a reproduction of, or replacement for, the existing structure; deducting accrued depreciation from the reproduction or replacement cost; and adding the estimat[ed] land value plus an entrepreneurial profit." Elliott W. Weinstein, *The Art of the Testimony: The Real Estate Appraiser, the Appraisal and the Expertise of the Expert Witness*, *available at* 15-8 ABIJ 32 (1996).

Coastal disputed the District's appraisals, arguing that they exceeded the true market value of the caverns. Coastal retained an independent appraiser, Bolton & Baer ("B&B"), which arrived at different valuations by using the market data comparison method,

---

[3] The statute reads:

If the chief appraiser uses the cost method of appraisal to determine the market value of real property, the chief appraiser shall:

(1)    use cost data obtained from generally accepted sources;

(2)    make any appropriate adjustment for physical, functional, or economic obsolescence;

(3)    make available to the public on request cost data developed and used by the chief appraiser as applied to all properties within a property category and may charge a reasonable fee to the public for the data;

(4)    clearly state the reason for any variation between generally accepted cost data and locally produced cost data if the data vary by more than 10 percent; and

(5)    make available to the property owner on request all applicable market data that demonstrate the difference between the replacement cost of the improvements to the property and the depreciated value of the improvements.

TEX. TAX CODE ANN. § 23.011 (Vernon 2008).

which is also specifically recognized by a Texas statute.[4]  *See id.* § 23.013 (Vernon 2008).[5]

This method "involves the determination of value for a specific parcel of property by inference from the sales prices of comparable properties."  *See* Weinstein, 15-8 ABIJ 32. Coastal argued that applying the market data comparison method would have yielded a value of $590,000 for Hiltpold #1 and $585,000 for Hudson #3.

Coastal filed a Notice of Protest with the Matagorda County Appraisal Review Board.  *See id.* § 41.413(a) (Vernon 2008) ("A person leasing tangible personal property who is contractually obligated to reimburse the property owner for taxes imposed on the property is entitled to protest before the appraisal review board . . .").  The review board denied the protest, however, and Coastal filed suit in district court seeking to have the appraisal amount reduced.  *See id.* § 42.015(a) (Vernon 2008) ("A person leasing property who is contractually obligated to reimburse the property owner for taxes imposed on the property is entitled to appeal an order of the appraisal review board determining a protest brought by the person under Section 41.413.").

A bench trial was held on December 11 and 12, 2001.  At the trial, the District called two witnesses to testify about the details of the cost method used by P&A when it assessed the Hiltpold #1 and Hudson #3 caverns: Vince Maloney, the Chief Appraiser for the District,

---

[4] The market data comparison method is also known as the sales comparison method.  Coastal used the term "sales" in the trial court and in its briefing, but we will use the term "market data" because it is the term used in the tax code.  *See id.* § 23.013 (Vernon 2008).  The tax code provides: "If the chief appraiser uses the market data comparison method of appraisal to determine the market value of real property, the chief appraiser shall use comparable sales data and shall adjust the comparable sales to the subject property." *Id.*

[5] The statute reads: "If the chief appraiser uses the market data comparison method of appraisal to determine the market value of real property, the chief appraiser shall use comparable sales data and shall adjust the comparable sales to the subject property." *Id.*

and Sam Harris, a representative from P&A. On cross-examination, Coastal did not question these witnesses about the relative merits and flaws of the cost method. Instead, Coastal offered a witness of its own, David Bolton of B&B, who explained the details of B&B's market data comparison method.[6]

On January 23, 2002, the trial court signed a judgment in favor of the District. On April 22, 2002, the trial court issued findings of fact and conclusions of law. Among the findings of fact were the following three, which are now challenged by Coastal on appeal:

> 7. For the tax years 1996 through 1999, inclusive, Plaintiff [Coastal Liquids] adduced no evidence, or alternatively, insufficient evidence, to support a determination by the Court that the assessed value of the subject property according to the Defendant's [the District's] appraisal rolls exceeded the market value of the property.
>
>    . . . .
>
> 10. Except as provided in Finding of Fact #10 [sic.][7], for the tax years 1996 through 1999, inclusive, the evidence supports a determination that the assessed value of the subject property according to the Defendant's appraisal rolls does not exceed the market value of that property.
>
> 11. For each of the tax years 1996 through 1999 inclusive, the appraisal rolls shall reflect a value of $1,025,000.00 for the Hiltpold #1 storage cavern and $825,000 for the Hudson #3 storage cavern.

Among the conclusions of law were the following two, which are now challenged by Coastal on appeal:

> 1. For the tax years 1996 through 1999, inclusive, there is no evidence as a matter of law (a) that the subject property's assessed value is greater than the market value of the property for any relevant tax year (except as stated in Finding of Fact #10 [sic. [9]], (b) that the subject property's assessed value

---

[6] Bolton was not the only witness offered by Coastal, but he is the only witness relevant to this appeal. Two witnesses testified about the first issue in this case that was resolved by the Texas Supreme Court; one witness testified about the issue of appropriate attorney's fees.

[7] This is a typographical error; Finding of Fact #9 should be referenced, not Finding of Fact #10.

for any relevant tax year should be reduced because the Defendant assessed the property unequally, (c) that the subject property in any relevant tax year was subjected to a multiple appraisal, or (d) that the Defendant improperly included non-taxable elements of value in its assessment of the subject property in any of the tax years 1996 through 1999, inclusive.

2. The subject property was properly subjected to ad valorem taxation pursuant to Texas law.

The questions now before us on remand are whether there was legally and factually sufficient evidence for the trial court to have upheld the District's valuation of Hiltpold #1 and Hudson #3 at $1,025,000 and $815,000, respectively, and whether Coastal is entitled to recover attorney's fees. *See id.*

## II. STANDARD OF REVIEW

Coastal, as the plaintiff in this case, bore the burden of proving at trial that the District's appraisal was incorrect. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *see also Hodge v. Dallas Cent. Appraisal Dist.*, No. 05-06-01418-CV, 2007 Tex. App. LEXIS 9085, at *8 (Tex. App.–Dallas Nov. 19, 2007, pet. denied). At the conclusion of the bench trial, the court issued findings of fact which have the same force and effect as a jury's verdict. *Gregory v. Sunbelt Sav., F.S.B.*, 835 S.W.2d 155, 158 (Tex. App.–Dallas 1992, writ denied). Coastal now challenges certain adverse findings on legal and factual sufficiency grounds.

When we review for legal sufficiency, we review the record to determine if there is evidence to support the finding, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005). When the plaintiff bears the burden of proof at trial and receives a negative finding, we will only reverse that finding for legal insufficiency if the

6

plaintiff on appeal conclusively establishes the opposite of the finding. *Id.*

When reviewing factual sufficiency points, we do not merely substitute our opinion with that of the trial court, but rather we "consider and weigh all of the evidence and will set aside the verdict only if the evidence is so weak or the finding so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.* at 826.

We review the conclusions of law de novo. *State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996). Under a de novo review, we exercise our own judgment and redetermine each legal issue. *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1999). A conclusion will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

### III. ANALYSIS

For the reasons given below, we believe there is sufficient evidence to uphold the trial court's findings that Hiltpold #1 is properly valued at $1,025,000 and Hudson #3 at $815,000.

### A. Reviewing the Findings for Legal Sufficiency

We first note that all taxable property must be "appraised at its market value." TEX. TAX CODE ANN. § 23.01(a) (Vernon 2008). Market value means the price at which a property would transfer for cash or its equivalent under prevailing market conditions if:

(A)    exposed for sale in the open market with a reasonable time for the seller to find a purchaser;

(B)    both the seller and the purchaser know of all the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions on its use; and

(C)    both the seller and purchaser seek to maximize their gains and

7

> neither is in a position to take advantage of the exigencies of the other.

TEX. TAX CODE ANN. § 1.04(7) (Vernon 2008). Texas law provides three commonly accepted methods for appraising market value: the cost method, the market data comparison method, and the income method. *Houston R.E. Income Props. XV, Ltd. v. Waller County Appraisal Dist.*, 123 S.W.3d 859, 861 (Tex. App.–Houston [1ˢᵗ Dist.] 2003, no pet.) (citing *Religious of the Sacred Heart v. City of Houston*, 836 S.W.2d 606, 615-17 (Tex. 1992)). The chief appraiser generally selects which appraisal method to use. TEX. TAX CODE ANN. § 23.0101 (Vernon 2008) ("In determining the market value of property, the chief appraiser shall consider the cost, income, and market data comparison methods of appraisal and use the most appropriate method.").

Applying the cost method, the District determined that Hiltpold #1 and Hudson #3 should be valued at $1,025,000 and $815,000, respectively, and the trial court issued findings of fact upholding these figures. At trial, the District presented two witnesses whose testimony provided significant evidence supporting the trial court's finding. First, the District called Maloney, the Chief Appraiser for the District. He testified that according to the contract between the District and P&A, the payment due to P&A for appraisal services did not depend upon the exact figure it assessed. Maloney further testified to the reliability of P&A by explaining that it was the responsibility of P&A to defend its appraisals in court at no extra expense to the District.

The District next called Harris, a representative of P&A who had experience appraising or assisting in the appraisal of between sixty and seventy storage caverns. Harris's testimony, which consisted of a reasonably detailed explanation of P&A's appraisal

8

methodology, was perhaps the most important evidence presented to the trial court. Harris explained that in 1986 or 1987, P&A attempted to establish a valuation method for underground caverns that would be acceptable throughout the natural gas industry. He testified that P&A focused on gathering information about the process and expenses involved in natural gas storage:

> [We] talked to everyone that would talk to us about what it cost to drill a well, what it cost to outfit it with the piping valves and fitting and Christmas tree,[8] and from that we arrived at what we thought was a reasonable valuation for the drilling and piping in the well and then the leaching.

According to Harris, P&A then assembled representatives from each of the companies that had underground storage facilities at that time, and the parties settled upon using a cost method, which essentially determined market value by aggregating the current costs for the construction of replacements of the caverns. The parties agreed to a schedule of the costs for all aspects of the cavern—including piping valves, fittings, and drills, among other things.[9] Moreover, the parties agreed that the cost of leaching salt caverns in order to expand their size was fifty cents for the first one million barrels of natural gas capacity and thirty-five cents for all barrels thereafter.

According to Harris, upon reaching these figures and assembling them into a schedule,[10] the valuation of the cavern became little more than the performance of an

---

[8] The website of the United States Department of Energy provides a helpful explanation of this term, which is commonly used in the drilling industry: "[S]ome natural gas flows freely to wells because the natural pressure of the underground reservoir forces the gas through the reservoir rocks. These types of gas wells require only a 'Christmas tree', or a series of pipes and valves on the surface, to control the flow of gas." *See* United States Department of Energy, *Getting Gas from the Ground . . . and the Sea, available at* http://fossil.energy.gov/education/energylessons/gas/gas_production.html. (last visited April 25, 2008).

[9] The District submitted this schedule as an exhibit to the trial court.

[10] Harris testified that although this schedule was originally agreed upon in 1986 or 1987, it was updated in 1993.

equation: "P&A determined how big a cavern was and then multiplied capacity times the cost estimates, less a capacity factor." The application of this equation, he explained, yielded the appraisal values announced by P&A and subsequently upheld by the trial court.[11]

On cross-examination, Coastal did not ask Harris a single question about any deficiencies in this method. Instead, Coastal questioned whether certain elements of Harris's testimony may have constituted hearsay. For example, Coastal objected that Harris did not have first-hand knowledge of the capacity of the caverns, and therefore, his testimony on this point constituted hearsay. The trial court overruled this objection, and Coastal does not appeal on this ground. Furthermore, when Coastal presented evidence at trial, it called a witness, Bolton, whose testimony did not explain deficiencies in the cost appraisal method explained by Harris. Instead, Bolton merely testified that he appraised the salt caverns using a different method—the market data method—and obtained a different result.

This testimony from Bolton—which was the only evidence from Coastal that related

_____

[11] Although Harris did not insert the relevant figures into the equation and perform mathematics on the stand, the appellee's brief does apply the equation, and it explains precisely how the cost apprisal method yielded the particular values it did.

> [F]or Hiltpold #1, the value of the property was calculated by multiplying 1,000,000 barrels times 50 cents (equals $500,000) plus 1,500,000 barrels times 35 cents (equals $525,000); total equals $1,025,000. For Hudson #3, the value of the property was calculated by multiplying 1,000,000 barrells times 50 cents (equals $500,000) plus 900,000 barrels times 35 cents (equals $315,000); total equals $815,000.

Brief of Respondent-Appellee at 28, *Coastal Liquids Partners, L.P. v. Matagorda County Appraisal Dist.*, No. 13-02-00237-CV (Tex. App.–Corpus Christi Dec. 4, 2002).

significantly to the issue of the cavern's valuation[12]—did not "conclusively establish" the opposite of the trial court's findings of fact in favor of the District, and therefore we conclude that the findings were legally sufficient. *See City of Keller*, 168 S.W.3d at 811.

## B. Reviewing the Findings for Factual Sufficiency

In our factual sufficiency review, we are obligated to consider the evidence both favorable and unfavorable to the trial court's findings, and we may only reverse if the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.* at 826. The unfavorable evidence, however, is little more than testimony from Coastal's independent appraiser, Bolton, stating that the market data comparison method to appraising salt caverns is superior to the cost method.

Coastal's method of appraisal is as compelling as the District's method, and both methods are recognized under Texas law. *Houston R.E. Income Props.*, 123 S.W.3d at 861. The fact that one method was selected over the other by the District's chief appraiser, and this was upheld by the trial court, hardly strikes us clearly wrong and unjust. *City of Keller*, 168 S.W.3d at 826. Because both appraisal methods are equally applicable, we are obligated to defer to the finding made by the trial court, which was better situated to analyze the evidence presented by each party. *Houston R.E. Income Props.*, 123 S.W.3d at 864.

## IV. ATTORNEY'S FEES

Coastal seeks reasonable attorney's fees, but such fees are only permitted under the tax code if "a property owner . . . prevails in an appeal to the court." TEX. TAX CODE

---

[12] As we have explained, Coastal's other witnesses generally addressed issues that are not relevant in this opinion. *See* n. 6, *supra*.

11

ANN. § 42.29 (Vernon 2008). Because Coastal has not prevailed in this case, the trial court properly denied attorney's fees.

## IV. CONCLUSION

Because we find factually and legally sufficient evidence supporting the trial court's findings of fact as to the valuation of the salt caverns and no basis upon which to award attorney's fees to Coastal, we affirm the judgment of the trial court.

_____
GINA M. BENAVIDES,
Justice

Memorandum Opinion On Remand delivered
and filed this the 30th day of April, 2008.